## CORDER v. O'NEILL, Appellant.

### Division Two, June 30, 1903.

1. **Breach of Contract: ACTION FOR FRAUD.** Plaintiff in his petition alleged that he had a contract with defendant to pay him five thousand dollars if he succeeded in inducing a third party to buy his mining property for ninety thousand dollars before a certain date, that he succeeded in making said arrangement, and that before that date the third party sought an extension of the time for thirty days, which defendant verbally agreed to grant, but on said last-mentioned date refused to carry out said agreement, in order to cheat and defraud the plaintiff out of his said commission, but then promised to said third party that he would renew said agreement next day, and on that day entered into another agreement with him by which he would for $95,000 sell him said property within the thirty days, and that sum being paid within that time, the trade was consummated. *Held*, that while the contract entered into by defendant with plaintiff is according to the petition the origin of the action, the suit is not in fact one on the contract for damages for its breach, but a concise statement of a cause of action for fraud, alleging the damages sustained by plaintiff because of the fraudulent conduct of defendant, to be $5,000. The statute of frauds, therefore, has no application to the cause of action stated in the petition.

Vol 176 mo—26

2. ——: ——: AGENT'S COMMISSION. Courts zealously guard against the efforts of principals to avoid the payment of legitimate commissions to agents whom they have employed in the sale of their property. Such contracts are presumptively entered into in good faith, and, in administering the law, courts will protect the interests of the parties according to the true spirit and meaning of the contract. The rule is that, "where the broker is the instrument through which the sale has been effected, no sort of artifice, deceit or fraud will deprive him of his commission."

3. ——: ——: ——: AGENCY: EVIDENCE OF FACT. The testimony of a witness who testifies that the owner of the property stated to him that any thing he had to communicate could be made to his son-in-law, that the son-in-law did his business, and that the son-in-law's act was his act, is sufficient evidence to submit to the jury the question of whether or not the son-in-law was the agent of the owner in extending the time for consummation of the sale.

4. ——: ——: AMOUNT OF DAMAGES. In a suit by a broker against the owner of property, founded on the fraud of the owner in depriving the broker of his commission, the instruction can not direct the jury to find for plaintiff in a fixed sum. The suit is not an action on the contract which named that sum as the broker's commission if he effected the sale, but one for fraud, in depriving him of his commission by the use of artifice and deceit. The damages in such case are unliquidated, and the instruction should tell the jury that, if they find for plaintiff, they should assess his damages at such an amount as they may believe from the evidence he is entitled to, not to exceed the sum named in the petition.

Appeal from Jasper Circuit Court.—*Hon. Jos. D. Perkins,* Judge.

REVERSED AND REMANDED.

*Edward Cunningham, Jr.,* and *Galen & A. E. Spencer* for appellant.

(1) The trial court erred in admitting evidence of the conversations, statements, interviews and alleged agreements between George H. Playter and George H. Bruen. Both were strangers to the suit, and to the contracts and transactions in controversy. (2) The trial court erred in admitting in evidence alleged statements, promises and agreements of George H. Bruen, there being no evidence of any authority in

Bruen to bind or to speak for defendant. R. S. 1899, sec. 3418. (3) The trial court erred in ruling and holding that there was any evidence before the jury showing, or tending to show, that George H. Bruen had any authority from the defendant to act or speak for defendant, or to bind defendant in making any change or alteration of the terms or conditions of the written contract between defendant and C. C. Playter for the sale of land, or in making any oral agreement or promise with Tibbets or C. C. Playter to extend the time for performance of that written contract, or to make any agreement altering or affecting said written contract or its performance. R. S. 1899, sec. 3418. (4) The trial court erred in giving, at the instance of the plaintiff, instruction 1. (5) The trial court erred in giving, at plaintiff's instance, instruction 2. (6) The trial court erred in refusing the instruction asked by defendant, that there was no evidence of any binding or lawful agreement on the part of the defendant to grant an extension of time for performance of the contract between C. C. Playter and defendant of date March 22, 1899. (7) The trial court erred in directing the verdict for interest upon damages.

*E. O. Brown, Thos. Dolan* and *C. V. Buckley* for respondent.

(1) It was immaterial whether Playter was buying for himself or another. The evidence was abundant to show who his principal was and that appellant knew it; but this was not necessary to respondent's recovery. Gelatt v. Ridge, 117 Mo. 553. (2) The statute of frauds has no application to Bruen's actions as agent for appellant; he did not make the sale; it was done by his principal. Every act was approved by appellant. He was simply an intermediary. The contracts themselves were made by his principal. (3) A real estate owner can not, by extending the time for completing

a sale negotiated by his agent, deprive the agent of his commissions.    Brackenridge v. Claridge, 43 L. R. A. 593.    (4)  A principal can not, by any contrivance, chicanery, manipulation or fraud, relieve himself from paying his broker his compensation, where the sale is to the purchaser produced by the broker.    Brackinridge v. Claridge, supra.    (5)  The principal can not, by any contrivance, escape his liability to his agent for services performed by the latter; nor elude the full performance of his contract to him.    The general rule is that the principal must act in good faith towards the broker, and a breach of faith on his part will not bar the broker's right to commissions.    Davis v. Gassette, 30 Ill. App. 41; Howe v. Werner, 7 Colo. App. 532; Gottschalk v. Jennings, 1 La. Ann. 5, 45 Am. Dec. 70; Gillet v. Corum, 7 Kan. 156; Neiderlander v. Starr, 50 Kan. 770; Ratts v. Shepherd, 37 Kan. 20; Fultz v. Wimer, 34 Kan. 576.    The principal can not set up his own dereliction of duty as a reason for his non-fulfillment of the contract, and thus avoid payment of the broker's commissions.    Cavender v. Waddingham, 2 Mo. App. 554; Witherell v. Murphy, 147 Mass. 417; Vanderveer v. Suydam, 83 Hun 116; Howe v. Werner, 7 Colo. App. 630; Ratts v. Shepherd, supra.    It may be stated generally that if the broker performs his part of the contract by doing all that he is required to do, and is prevented from or deprived of the opportunity of consummating the sale by the act of the principal, he is still entitled to his commission, as the principal can not wrongfully interfere with the broker in his performance of the contract.    Fischer v. Bell, 91 Ind. 244; Lane v. Albright, 49 Ind. 279; Hawley v. Smith, 45 Ind. 183; Chilton v. Butler, 1 E. D. Smith 151; Doonan v. Ives, 73 Ga. 301; Hartley v. Anderson, 150 Pa. 391; Keys v. Johnson, 68 Pa. 42; Howe v. Werner, 7 Colo. App. 532; Reynolds v. Tompkins, 23 W. Va. 235; Williams v. Bishop, 11 Colo. App. 378; Clifford v. Meyer, 6 Ind. App. 633; Wilson v. Dyer, 12 Ind. App. 320;

Lynch v. McKenna, 58 How. Pr. 45; Wooley v. Leow, 80 Hun 295; Carroll v. Pettit, 67 Hun 418; Larow v. Bozarth, 68 Mo. App. 411; Jacobs v. Shennon, 2 Idaho 1002; Briggs v. Rowe, 1 Abb. App. 195; Satterthwaite v. Vreeland, 3 Hun 152; Levy v. Kottman, 11 Misc. 372; Bennett v. Egan, 3 Misc. 421; Henderson v. Vincent, 84 Ala. 99; Byrd v. Frost (Tex. Civ. App.), 29 S. W. 46. So, the broker's right to commissions is not affected by the fact that the principal takes the matter out of his hands and deprives him of the benefit of the deal, with a knowledge that in so doing he is acquiring to himself the benefit of the broker's services, and is preventing the fulfillment of the contract by the broker. Carroll v. Pettitt, 67 Hun 418; Wilson v. Sturgis, 71 Cal. 229; Phelan v. Gardner, 43 Cal. 306; Blood v. Shannon, 29 Cal. 398. The broker is entitled to be protected against any unfairness or fraud, and the owner, where there is a general employment to sell, can not avail himself of the services of the broker in finding a purchaser, and then, by taking the negotiations into his own hands and reducing his price, effect a sale and refuse payment of commissions. Briggs v. Rowe, 1 Abb. App. 195; Heaton v. Edwards, 90 Mich. 500; Lane v. Albright, 49 Ind. 279; Henderson v. Vincent, 84 Ala. 99; Larow v. Bozarth, 68 Mo. App. 411; Geery v. Pollock, 16 App. Div. 321; Wooley v. Loew, 80 Hun 295. And a principal can not deprive his agent of his compensation by selling at a different price, or by switching the buyer from one agent to another with whom he might be more friendly, and thus open the way for the perpetration of the rankest injustice. Wright v. Brown, 68 Mo. App. 577; Hayden v. Grillo, 35 Mo. App. 654. So, the principal can not impose conditions other than, and in addition to, the conditions named in the contract under such circumstances as to prevent the broker from receiving his commissions. Gaty v. Foster, 18 Mo. App. 644. If the performance of the contract by the broker is prevented by the act of

his principal, the broker may recover in damages such sum as would fully compensate him for the injury which he has sustained by reason of the non-performance of the contract.   Lane v. Albright, 49 Ind. 279; Blaydes v. Adams, 35 Mo. App. 526.   It may be stated as a general doctrine of the law governing the question of the revocation of a real estate broker's agency that such agency can not be revoked in bad faith as a device for escaping payment of commissions.   Carroll v. Pettitt, 67 Hun 418; Ware v. Dos Passos, 4 App. Div. 35; McKnight v. Thayer, 48 N. Y. S. 622; Ames v. McNally, 6 Misc. 94; Stedman v. Richardson, 100 Ky. 79; Lipe v. Ludewick, 14 Ill. App. 375; Sibbald v. Bethlehem Iron Co., 83 N. Y. 378, 22 Am. Rep. 441; Smith v. Anderson, 2 Idaho 495; Schuster v. Martin, 45 Ill. App. 481; Lapsley v. Holridge, 71 Ill. App. 652; McConaughy v. Mahannah, 28 Ill. App. 169; Wilson v. Dyer, 12 Ind. App. 320; Doonan v. Ives, 73 Ga. 301; Geery v. Pollock, 16 App. Div. 321; Cook v. Forst, 116 Ala. 395; Woolley v. Leow, 80 Hun 295; Gillett v. Corum, 7 Kan. 156; Gottschalk v. Jennings, 1 La. Ann. 5, 45 Am. Dec. 70; Prickett v. Badger, 1 C. B. N. S. 296, 26 L. J. C. P. N. S. 33, 3 Jur. N. S. 66; Henderson v. Vincent, 84 Ala. 99.

STATEMENT.

This action was commenced in the Jasper Circuit Court, November 7, 1899.   Upon the trial of the cause there was a judgment for plaintiff in the sum of $5,306.65; from this judgment, in due time and form, defendant prosecuted this appeal.   The record is now before us for review.

The plaintiff's petition contained four separate counts, but before the case was submitted to the jury the plaintiff abandoned and dismissed the first, second and fourth counts, so that all that is left of the petition is the third count, and is in the words and figures following:

"Third.   The plaintiff further states that he now
is and was at all times hereinafter mentioned engaged
in the business of selling real estate, mines, mining prop-
erty and leases on mining property in Jasper county,
Missouri, as agent for such persons or concerns as
might employ him therefor, and on March 22, 1899, the
defendant, James O'Neill, was the owner of a certain
lease known and described as the 'Get There' lease, in
or near the city of Carterville, in said county, and on
said day he was desirous of selling the same.   That at
the same time plaintiff had as customer for a piece of
mining property one C. C. Playter, who desired for
himself and others, and especially for one R. Tibbets,
of Boston, Massachusetts, to purchase a mining lease in
Jasper county, and on said date the defendant entered
into a contract with the plaintiff, whereby he agreed
that if the said Playter, or his assigns, should take the
lease of the defendant, known as the 'Get There' lease,
and should comply with the conditions of a contract
made with said Playter, or his assigns, for said lease,
and should pay to the defendant the sum of ninety thou-
sand dollars in cash for said lease on or before the first
day of May, 1899, then the defendant will pay the plain-
tiff the sum of $5,000, in full for all commissions and
compensation for services rendered by the plaintiff in
and about the sale of said 'Get There' lease.   That the
defendant and said Tibbets, acting through the said
Playter (the defendant at all times knowing that said
Playter was the agent of said Tibbets in the purchase of
said lease), entered into a contract, whereby said
O'Neill sold to the said Tibbets, or agreed to sell to said
Tibbets, for the sum of $90,000 the said 'Get There'
lease; $5,000 to be paid in cash, and the balance of said
purchase money on or before the first day of May, 1899.
That said Tibbets was fully able to pay said balance of
$85,000 when due.   That said Tibbets at the time of said
contract paid to defendant, or into the bank for his use,
the sum of $5,000.   That during the existence of such

contract the said Tibbets, through his said agent, requested of the defendant that he would extend the time for the payment of the balance of the purchase money for said lease until the first day of June, 1899. Said contracts are herewith filed, marked Exhibits 'A' and 'B.' Plaintiff further states that at the time of procuring said property for sale, defendant only asked the sum of $85,000 therefor, and by agreement with defendant offered and contracted said property for the sum of $90,000, it being agreed that the excess over $85,000, to-wit, $5,000, should be paid by defendant to plaintiff for making said sale. That within the time limited plaintiff sold said property for $90,000 to one Frederick R. Tibbets, on March 22, 1899, and $5,000 of the purchase price was thereupon paid by said Tibbets to defendant, and the balance was to be paid by said Tibbets on or before May 1, 1899. That about the 25th day of April, 1899, and on the 30th day of April, 1899, said Tibbets had an oral agreement with defendant, wherein defendant promised that if upon the first day of May, 1899, said Tibbets would pay $10,000 he would extend said contract for thirty days, giving said Tibbets that much more time to purchase said property; that said Tibbets and the plaintiff relied upon said promise and agreement, and at the time said agreement was made said Tibbets was able and willing to put up and pay to defendant the balance due on said first-mentioned contract, and on or before May 1, 1899, comply with all its terms, and would have made said payment and complied with all its terms by the first of May had it not been for said verbal agreement, and was prevented from so doing and lulled into security, in the premises by reason of said verbal agreement. That on said first day of May, said Tibbets offered and tendered to defendant said $10,000, but the defendant for the purpose of cheating and defrauding plaintiff out of his said commissions, refused and deferred any action thereon or making any contract on that day, but promised and agreed

that after the expiration of that day he would make a contract with said Tibbets giving him until June 1, 1899, to consummate said deal for said lease. That thereafter, to-wit, on the 2d day of May, 1899, in pursuance of his said scheme to cheat and defraud plaintiff out of his said commissions, defendant had drawn up new papers to carry out his sale to said Tibbets, which said papers were of like import with said original contract, except time for consummation of said sale was extended to June 1, 1899, and Tibbets required to pay $10,000 in addition to amount specified in original contract. That in pursuance thereto said Tibbets paid $10,000 on May 10 and the balance on June 1, 1899, at which time said lease was duly transferred by defendant to Tibbets. That by reason of breach of said verbal agreement and promise to extend said original contract by defendant and by reason of the fraud thereby practiced on plaintiff by defendant, plaintiff is damaged in the sum of $5,000, for which sum, together with costs, plaintiff prays judgment.''

The answer of the defendant denied each and every allegation contained in the plaintiff's petition.

The contract mentioned in the petition entered into by the defendant with the plaintiff, was introduced in evidence, and is as follows:

"March 22, 1899.

"If, on or before May 1, 1899, C. C. Playter, or assigns, pays to me the full sum of ninety thousand dollars cash, in performance of the contract I have made with Playter for the sale of my lease, known as the 'Get There' lease, and fully complies with all the conditions of said contract, I agree to pay to Hal Corder, of Joplin, Missouri, the sum of five thousand dollars in full for all commissions and compensation for services in and about said sale. No money whatever to be due and payable except on full performance of all the above named conditions.

"James O'Neill."

The plaintiff next offered in evidence the contract referred to in the preceding instrument by which the sale of the "Get There" lease, signed by James O'Neill on the one part, and C. C. Playter on the other, was made. Said contract is as follows:

"This agreement, made this 22d day of March, A. D. 1899, by and between James O'Neill, as first party, and C. C. Playter, as second party, witnesseth: That whereas, first party has this day sold to second party his lease on the northeast quarter of the southeast quarter of section twenty-one, township twenty-eight, range thirty-two, in Jasper county, Missouri, together with certain machinery thereon, for ninety thousand dollars cash, to be paid on or before May 1, 1899, and has this day executed proper conveyance thereof, which conveyance is hereby referred to for a more specific description of the property conveyed: Now, it is agreed that if second party shall on this date pay first party five thousand dollars cash, first party will in consideration thereof, deposit such conveyance with a duly executed copy hereof, with the First National Bank of Carterville, Missouri, and if second party, or his assigns, shall, on or before May 1, 1899, pay into said bank, to the credit of first party the further sum of eighty-five thousand dollars cash, and comply with all the conditions hereof, said conveyance shall then be delivered to second party or his assigns. If second party, or assigns fails to make such payment of $85,000 within the time above limited, then such conveyance shall be returned to first party, and said bank is hereby authorized and directed to deliver same to him, and he shall hold and retain said five thousand dollars as compensation for the making of this contract and the depositing of said conveyance (said payment being made as a consideration therefor, and only to be credited on price in the event the further sum of $85,000 is paid within the time limited) and all rights of second party, or assigns, concerning said property, or the purchase

thereof, shall end. It is agreed that time is the essence of this contract, and all agreements of said party must be strictly complied with on or before May 1, 1899, ana all rights hereby granted him shall end on said date.

"Said conveyance shall be taken subject to all subleases, mining rights, contracts or licenses in force on said premises on the date of delivery of said conveyance. Second party shall by written agreement assume the payment of all orders made on and accepted by first party in the operation of said land. Second party shall also by a written agreement, bind himself, and assigns, to pay or allow to Thomas J. Steers his rebate or royalty on all ores mined from the Laura S. mine on mining lots fourteen and fifteen of said land, said rebate being two and one-half per cent gross on zinc and five per cent gross on lead; also to pay or allow to Lively & Company their rebate or royalty on all ores cleaned on their tailing mill on said land, said ores being produced by cleaning tailings in said mill.

"Until the payment of said sum of $85,000 first party shall continue to operate and mine said land and collect and hold for his own use and benefit all rents, revenues and royalties therefrom, as if this agreement had not been made.

"Witness our hands the day and year first above written. Executed in triplicate.

"JAMES O'NEILL,
"C. C. PLAYTER."

There was some conflict in the testimony. Will say, however, that the testimony tended to prove the allegations in the petition, and the testimony of the defendant tended to prove his theory of the defense to this action.

The testimony bearing most strongly upon plaintiff's theory of his cause of action, is that relative to the extension of the time of payment from the 1st day of May to the 1st of June. This testimony being so

vital, we here quote the testimony of C. C. Playter and his brother, Geo. Playter:

"*C. C. Playter*, sworn as a witness on behalf of the plaintiff, testified as follows:

"Q.  Where do you reside now?  A.  Aurora, Missouri.  I resided here in Joplin in March, 1899.

"Q.  Prior to that?  A.  Well, I was at Pittsburg, Kansas, about six months previous to that time.

"Q.  Never mind.  I thought you were from Boston.  A.  No, sir.

"Q.  Acquainted with Col. O'Neill?  A.  Yes, sir.

"Q.  State if you are the C. C. Playter who negotiated the sale or the purchase, rather, of the 'Get There' lease?  A.  I am.

"Q.  For whom were you acting at that time?  A. Frederick R. Tibbets, of Boston.

"Q.  Did you have any conversations or were your dealings direct with Col. O'Neill or Bruen?  A.  My dealings up to the date of the contract was made with Bruen.

"Q.  That was before March 22?  A.  Yes, sir.

"Q.  You are the C. C. Playter that made the contract of March 22?  A.  Yes, sir.

"Q.  On behalf of Frederick R. Tibbets, of Boston?  A.  Yes, sir.

"Q.  Did you have anything to do with the transaction after making that contract?  A.  Why, I signed the second contract that was made.

"Q.  That was the contract of March 22.  Did you sign the first one?  A.  Yes, that is the first.

"Q.  Did you have any dealings with Col. O'Neill or his son-in-law, Mr. Bruen, subsequent to that time?  A.  I saw Mr. Bruen on the first day of May in regard to the payment on the property that we were to make.

"Q.  Did you have an agreement—was it you or your brother that had the agreement regarding the payment of that $10,000?  A.  My brother.  I went with my brother to make the payment.

"Q. State what took place at that time on the first of May? A. My brother and I went over sometime before noon. Went into the office and Mr. Bruen was there. We told him we had come over to make a contract according to the agreement between Bruen and my brother. That was to pay $10,000 and get an extension.

· "Q. What took place between you and your brother and Mr. Bruen? A. We went in and I told Mr. Bruen that we were ready to make the payment and he said that Mr. O'Neill had refused to make any agreement until the other agreement had lapsed the next day.

"Q. What was his reason for that? A. He said he didn't want to have two contracts out at the same time on the same property.

"Q. Was there any other contract out regarding that property except this agreement of Col. Corder's? A. Not that I know of.

"Q. What else took place? A. I told Bruen we had come over on the strength of the understanding between he and my brother, and I didn't see that it made any difference. That we were there to make a new contract to take up the old contract and the making of the new contract would not in any way make two contracts on the property, because they would take up the old one when the new one was made. He wouldn't listen to my plea and we couldn't do anything else. That was the only dealings had that day.

"Q. What arrangement as to subsequent meeting? A. My brother went to O'Neill and I left—

"Q. You don't know yourself about that? A. No, sir.

"Q. Were you present on the second of May? A. Yes.

"Q. Where? A. At Spencer's office in Joplin.

"Q. What time on the second of May? A. I didn't get there until about ten o'clock, after my brother and Mr. O'Neill had been there. They had been there before I got there and had talked over the matter.

"Q.   What took place there?   A.   When I came up my brother called me aside—

"Q. Just state what took place between you and your brother in the presence of O'Neill or Bruen or both of them?   A.   Well, I made complaint against the contract as I understood it with O'Neill—from the agreement understood—it was different from the agreement they wanted then.

"Q.   In what respect?   A.   That the $10,000 to be paid was additional to the purchase price.

"Q.   Who was insisting on that?   A.   Col. O'Neill.

"Q.   What was that contention?   A.   My understanding—

"Q.   State what was said there?   A.   I said that Mr. O'Neill—I considered he was going back on the contract he made with my brother—I didn't think he had any right to do it.   That was all I said to him.

"Q.   Was the deal finally closed there?   A.   A contract was made that day, yes, sir, in regard to the property.

"Q.   What was the purchase price?   A.   $100,000.

"Q.   State to the jury what at that time and previous thereto was the financial condition of Frederick R. Tibbets.   A.   So far as that is concerned, I can not say —I don't know.

"Q.   What I want to get at, Mr. Playter, is, whether if it hadn't been for the agreement to extend the time, he was able to complete the contract by May 1, as originally agreed upon?   A.   The payment was to have been made by the first of May.

"Q.   What payment?   A.   $85,000 on the first contract.   In case we had received no extension.

"Q.   Now, Mr. Playter, what money was paid on or after the second day of May for the purchase of this 'Get There' lease?   A.   $10,000 was paid about the 9th or 10th of May, I believe.   The balance on or before the first of June.

"Q.   What do you mean by balance?   A.   $85,000.

"Q. Did that make $100,000? A. All told, yes, sir.

"Q. Now state, Mr. Playter, if this is the contract you referred to as having been made on May 2? A. Yes, sir, that is the contract (marked 'C').

"Q. Now, I will ask you if this is the assignment made to Frederick R. Tibbets, of Boston, Mass., of this 'Get There' lease by Col. O'Neill? A. To the best of my knowledge, it is.

"Q. The description there is of what is known as the 'Get There' lease, isn't it? A. Yes, sir.

"Q. Calling your attention to the matter of your conversation further with Mr. Bruen on the first of May, state if at that time you had a draft for $10,000? A. I did.

"Q. State if you offered that to Mr. Bruen? A. Yes, sir.

"Q. State the exact language of Mr. Bruen, so far as you can remember, that was used by him at that time regarding the expiration of this contract? A. Bruen said O'Neill refused to make a new contract until after midnight that night; that it would be out that night.

"Q. That was on the first of May? A. Yes, sir.

"Cross-Examination.

"Q. You didn't see Col. O'Neil on the first of May at all, did you? A. No, sir.

"Q. What conversations you had on the first of May were with Bruen? A. Yes, sir.

"Q. You say Mr. Bruen told you that when you wanted to pay $10,000 to get the contract for an extension, that Col. O'Neill wouldn't enter into any new contract during the life of the outstanding one? A. Yes, sir.

"Q. You have also said that you told him at that time that you didn't know of any contract that was out except the one with you? A. Yes, sir.

"Q. Did you at that time know of this contract between O'Neill and Corder to pay Corder $5,000? A. No, sir, I did not.

"Q. You didn't know anything about that? A. No, sir.

"Q. As a matter of fact you didn't know Corder was getting any commission from O'Neill? A. No, sir.

"Q. Your understanding was he was getting his commission from the other side, if any at all? A. No, sir.

"Q. At the time you said to Col. O'Neill that you didn't know of any other contract, you didn't know at that time of his contract to pay $5,000 that night if the property was taken that day? A. No, sir.

"Q. You didn't go to see O'Neill yourself after having this conversation with Bruen? A. No, sir.

"Q. What time of day was that? A. In the forenoon. I don't remember exactly. Somewhere about ten o'clock.

"Q. On the first day—the last day of the life of this contract between O'Neill and Corder, how much money did you have here of Tibbets'? A. $10,000.

"Q. You didn't have and never did have during the life of that contract, the money here to take it up? A. No, sir.

"Q. You were representing Tibbets? A. Yes, sir.

"Q. There was no other reason for that extension excepting lack of money? A. He wasn't ready to pay the money at that time.

"Q. According to that contract? A. Not if he could get an extension.

"Q. And you went over to see about getting the extension? A. Yes, sir.

"Q. Bruen told you O'Neill wouldn't give an extension? A. No, sir, didn't tell me that.

Corder v. O'Neill.

"Q. He told you he wouldn't enter into any other contract? A. Yes, sir.

"Q. And after the contracts expired, he would be at liberty to deal with you? A. Yes, sir.

"Q. And perhaps trade you the property? A. Yes, sir.

"Q. And after these contracts expired, a new contract was entered into that you have testified to, for that purpose? A. Yes, sir.

"Q. Have you with you any of the letters or telegrams you received from your client, Mr. Tibbets, just prior to the time you went over there on the first of May? A. No, sir.

"Q. What did you do with them? A. I think I have them on file.

"Q. Have you ever shown them to Mr. Buckley or Mr. Corder? A. No, sir.

"Redirect Examination.

"Q. The agreement about the extension of time to complete this contract was made before you went over there on the first of May? A. Yes, sir.

"Q. That wasn't made with you? A. No, sir, with my brother.

"*George H. Playter*, sworn as a witness on behalf of the plaintiff testified as follows:

"Direct Examination.

"Q. What relation are you to C. C. Playter? A. Brother.

"Q. Were you here on the 22d of March, 1899? A. Yes, sir.

"Q. Did you have anything personally to do with the transaction of that date between yourself or your brother and Col. O'Neill? A. I was here at the time and in the office at the time the contract was made. That was in Spencer's office.

"Q.   That contract was made between Col. O'Neill and your brother?   A.   Yes, sir.

"Q.   Who were you and your brother representing in that contract for the purchase of this 'Get There' lease?   A.   Frederick R. Tibbets, of Boston, Mass.

"Q.   Is that the same F. R. Tibbets to whom the assignment of the 'Get There' lease was finally made by Col O'Neill?   A.   Yes, sir.

"Q.   Now after the execution of that contract, of March 22, 1899, did you have any conversation or agreement with Col. O'Neill or Mr. Bruen, and if so, state what it was?   A.   I met Mr. Bruen and told him Mr. Tibbets was desirous of procuring an extension of time of thirty days for carrying out that contract.   He told me he would see Col. O'Neill and let me know whether they would do so or whether Col. O'Neill would do so, and a couple of days later I went to his office in Webb City and he said that he had a talk with the Colonel and on payment of $10,000 more that they would extend the time to June 1st.

"Q.   When was that payment to be made?   A. On or before the expiration of the contract—on or before May first.   I asked him whether $10,000 was to be considered as a bonus or to be applied on the purchase price, and he said it would be simply a payment of that much addition on the purchase price and the remainder of $75,000 to be paid on or before June 1st.   That was the substance of my arrangement and talk with Mr. Bruen.   This was several days previous, five or six days previous to the time the contract would expire.   I was satisfied with that and telegraphed Mr. Tibbets and he forwarded the money to be paid over.

"Q.   The $10,000?   A.   Yes, sir.   That was in a draft, Boston exchange.   Either the day previous to the first of May or on the first of May, I don't recall which it was now, I went with my brother to Webb City with the money and called on Mr. Bruen, and went into the office expecting to find Col. O'Neill and the Colonel

wasn't in.   I told him we had the money and my brother
showed him the draft and said that he was ready to sign
it over to him on the fulfillment of the making of the
extension of the contract.   Then he told me that
Col. O'Neill objected to closing up the matter that day.
That he wanted to wait until the present contract had
expired entirely and I told him that that put us in a
very awkward position in regard to our principal, Mr.
Tibbets, and he said that that was all he could do.   The
Colonel had just left going out to the mines and perhaps
I could catch him at the livery stable.   I walked down
and met the Colonel and talked to him and told him I
would like to fix the matter up to-day and explained
fully to him.   That was the first time I had been able to
see him.   He had been sick or where I couldn't get to
him and I considered —

"Q.   State what you said?   A.   I told the Colonel
I had had such an arrangement with Mr. Bruen as above
stated and that I would like to close the thing up and
pay the money over that day.   He demurred and said
that it would be against his judgment to make a con-
tract that day and gave me no final answer either one
way or the other whether he would or wouldn't fix the
matter up at all, except saying he would be over to
Joplin the next day as soon as he got the other contract
and would meet me at Judge Spencer's office for the
further consideration of the matter.

"Q.   Next day was May 2?   A.   I judge so, yes,
sir.   It was the second of May at any rate.   On May 2,
I met him at Judge Spencer's office and he said that he
hadn't understood the contract as I had agreed with
Bruen.

"Q.   About what?   A.   In regard to an extension
and the payment of the $10,000.   He said that that
would have to be an entirely new contract and the
$10,000 would be bonus, instead of being applied on
the purchase price.   I asked Mr. Bruen if our under-
standing wasn't exactly to the reverse of that—that it

was to be applied on the purchase price, simply carrying out the old contract, and he stated that that was his understanding.

"Q.   You and Mr. Bruen understood it the same? A.   Yes, sir, but that if he had so stated the proposition to Col. O'Neill, that Col. O'Neill had misunderstood him about it on that basis—that the Colonel hadn't understood his position in the matter.

"Q.   What you just stated—was that in the presence of Col. O'Neill?   A.   Yes, sir.

"Q.   Go ahead?   A.   That changed the matter so completely, so far as I was concerned and my relations with Mr. Tibbets—my statement to him as to my ability to carry out the contract by the payment of the additional $10,000 that I told him I didn't feel like giving him the money under those circumstances.   It resulted into our going over the matter pro and con and that he gave me time to take the matter up with Tibbets to see whether he would agree to make that sort of an arrangement, and the contract was drawn up wherein we were given until the 10th.

"Q.   You were given until the 10th?   A.   About ten days.   The balance on or before June 10.

"Q.   That is the contract of May 2, and the only contract that was entered into—written contract—between Tibbets and O'Neill or you and O'Neill, excepting the final transfer and the contract of March 22?   A. The only written contracts.

"Q.   Did you pay that $10,000?   A.   Yes, sir.

"Q.   Did you pay the rest of it within the life of the second contract?   A.   It was paid within the life of the second contract.

"Q.   How much was paid on that lease altogether by Mr. Tibbets?   A.   $100,000.

"Q.   Would you have carried out that contract and paid the money on or before the first of May, provided there hadn't been an agreement to extend it?   A.   Personally, of course not.   If I am allowed to state what

instructions I had from Mr. Tibbets, and what he wrote me.

"Q. Where are those letters? A. I suppose in my office. I never have been asked to look them up.

"Q. State whether or not, if you know, Mr. Tibbets was ready and willing and able to carry out that contract if the extension hadn't been agreed upon? A. Yes, sir; to the best of my knowledge and belief. I want to add that to it, of course.

"Q. Was anything said by Col. O'Neill or by him through Mr. Bruen about getting rid of any contract before making this second one? A. Mr. O'Neill told me he didn't want to make one contract until he was through with another one. Didn't want to get mixed up in it.

"Q. Was there any other contract except the Corder contract regarding this excepting the one you had? A. I knew nothing of any contract excepting the one I had.

"Cross-Examination.

"Q. You didn't know at that time there was any other contract out between O'Neill and Corder which expired on the first of May? A. No, sir.

"Q. The Colonel said, when you went to see him on the first day of May, that he didn't want to get mixed up with different contracts on that property? A. Yes, sir, didn't want to make one until he was through with another.

"Q. And wouldn't do anything towards granting an extension or anything else until the present contract expired? A. Told me he would make no arrangements whatever until the present contract expired.

"Q. You have said here, in answer to a question of Mr. Buckley's, that the arrangement would have been carried out if you hadn't had this talk about the extension. You get that from the correspondence which is here in Joplin? A. Yes, sir.

"Q.   It is all based upon that correspondence?   A. Certainly.

"Q.   And the statements in that correspondence consists of knowledge of letters and statements you sent to Tibbets—telegrams—and the replies you have on hands?   A.   No, I can hardly say that.   The letters I had from him stating that he would do such and such things.

"Q.   I don't care what the letters said, but it is from those letters?   A.   All my information is from correspondence I had from Mr. Tibbets.

"Q.   You don't know Mr. Tibbets personally?   A. Yes, sir.

"Q.   How long have you known him?   A.   For six or seven years.

"Q.   Now, in relation to Mr. Tibbets being able to take this property, you know, as a matter of fact, at no time was he able to take it and couldn't take it and finally turned it over to Colley & Co.   He couldn't take it himself?   A.   I couldn't state that.   If you want me to answer the question in full, he had arrangements made, so he told me, to take up this property on the first of May, if there wasn't an extension.

"Q.   That was in a letter?   A.   Yes, sir.

"Q.   If he had $80,000 at the time you have just spoken about, about the first of May, do you know what he had or what he did with that between that and the first of June?   A.   Tibbets is a broker back there, acting for other parties.

"Q.   This extension of time was asked simply and solely to enable him to get the money?   A.   No, sir.

"Q.   What was it for?   A.   With the idea of holding the property to go into our own company, termed the 'United Zinc Company.'

"Q.   A corporation he was organizing?   A.   It was organized at that time.

"Q.   When was it organized?   A.   In April, last year.

"Q. Then he had the corporation already organized before this time? A. Yes, sir.

"Q. And had its money? A. Some money, yes, sir. I don't know how much at that time.

"Q. He could have taken up the property and put it in the corporation? A. Not at that time.

"Q. He had the corporation, but didn't have the money? A. The United Zinc Company didn't have the money at that time to put into it.

"Q. That is what I say? The money was afterwards raised by selling stock? A. No, sir. Mr. Tibbets was at the same time selling properties to others. He had arrangements made, so he stated to me in his letters. All I know is through correspondence. He gave me the names of the parties who were willing to take up the property at the original purchase price, but in so doing, he would simply have gotten his money, but he wanted to keep it so as to get the United Zinc Company to take it.

"Q. Did you tell O'Neill that? A. No, sir.

"Q. Bruen? A. Yes, sir.

"Q. When? A. On the first of May.

"Q. The money was raised for this company by the sale of stock? A. Yes, sir.

"Q. You told Bruen all about that, did you? A. Yes, sir.

"Q. You say the first time you saw Bruen that he told you he would have to see O'Neill? A. He said that he wanted to see O'Neill about it.

"Q. Told you he would see O'Neill? A. Yes, sir.

"Q. Didn't tell you then and there he would make any contract with you as O'Neill's agent? A. No, sir.

"Q. But would carry your message to O'Neill? A. Yes, sir.

"Q. You weren't making any contract with him as the agent of O'Neill, but he said he would see O'Neill and let you know? A. Yes, sir.

"Q. How long afterwards until you saw him? A. Two or three days.

"Q. How long would that be before the first of May? A. Six or seven days.

"Q. You told us while ago that the first conversation was five or six days before the first of May? A. Along the latter part of April.

"Q. Wasn't it on Saturday, the 29th of April? A. No, sir, because I had time, I know, to write to Tibbets, and get the money.

"Q. That was when you first saw him? A. No, sir, after I got his answer at the time I wrote to Tibbets to get the money out here.

"Q. Where did you see Bruen the second time? A. At his office in Webb City.

"Q. When did you fix that time? A. From the fact that I had to write to Boston and get an answer back it must have been—

"Q. Didn't you testify at Carthage that you told O'Neill when you went out there, about the agreement you had with Bruen on Saturday before? A. That was on the first of May—let's see—the time I saw Mr. O'Neill—I saw Bruen three times, in Joplin, then over there when I went to see whether I could get an extension and then when I went to take the money. The last time was the first of May.

"Q. Didn't you tell Mr. O'Neill on Monday there about the agreement you had with Bruen for an extension on Saturday before? A. I told O'Neill what the agreement was with Bruen? I don't know what day.

"Q. What do you say about your former testimony that it was Saturday? A. May have been.

"Q. There wasn't time then, if it was Saturday, to write to Boston? A. The first time I saw him and the second time was the time I wrote to Boston.

"Q. It was on Saturday, then? A. It couldn't have been.

"Q. It was five or six days before you say here

you saw him in Joplin and you would not have time then to get the money? A. I don't know. The draft was sent through the mail, I know.

"Q. That was for $10,000? A. Yes, sir.

"Q. You telegraphed for that, didn't you? A. It might have been by telegraph, I don't know. Those things get old. I haven't thought of it since.

"Q. You testified to it a year ago? A. Yes, sir."

After the refusal of defendant, O'Neill, to extend the first contract with C. C. Playter, from May 1st to June 1st, on the next day, the second of May, the following agreement was entered into with Tibbets, the party whom Playter was representing:

"This agreement, made this 2d day of May, A. D. 1899, by and between James O'Neill, of Webb City, Missouri, as first party, and Frederick R. Tibbets, of Boston, Massachusetts, as second party,

"Witnesseth: That whereas first party has this day sold to second party his lease on the northeast quarter of the southeast quarter of section twenty-one, in township twenty-eight of range thirty-two in Jasper county, Missouri, together with certain machinery thereon, for the sum of ninety-five thousand dollars cash, all to be paid on or before June 1, 1899, and has this day executed proper conveyance thereof, which conveyance is hereby referred to for a more specific description of the property conveyed.

"Now, in consideration of the premises, and the sum of one dollar to him paid by second party, the receipt of which is hereby acknowledged, the said James O'Neill agrees that he will at once deposit a proper conveyance of all said leasehold property and effects, with a duly executed copy of this agreement, with the First National Bank of Carterville, Missouri, and if said party shall, on or before May 10th, instant, pay into said bank for said first party, the sum of ten thousand dollars, the said bank shall continue to hold said conveyance and transfer until the first day of June, 1899,

and if on or before said last-mentioned date, said second party or any one for him, shall pay into said named bank for said first party the further sum of eighty-five thousand dollars cash, then said conveyance and transfer shall be delivered to said second party or assigns.

"If said second party, or his assigns, fails to make said payments, to-wit, ten thousand dollars on or before May 10th, instant, and the further sum of eighty-five thousand dollars on or before June 1, 1899, as above stated, then such conveyance shall be returned to first party and said bank is hereby authorized and directed to deliver the same to him, and if the sum of ten thousand dollars payable on or before May 10, 1899, shall have been paid into said bank, as herein provided, but thereafter default has been made by second party in the payment of the further sum of eighty-five thousand dollars to be paid on or before June 1, 1899, then the said ten thousand dollars is to be retained by first party as compensation for the making of this contract and the deposit of said conveyance, said payment being made in consideration thereof, and only to be credited on purchase price in the event the further sum of eighty-five thousand dollars is paid within the time limited, and all rights of second party, or his assigns, concerning said property or the purchase thereof shall end. It is agreed that time is the essence of this contract, and all agreements of second party must be strictly complied with within the times herein stated.

"Said conveyance shall be taken subject to all subleases, mining rights, contracts or licenses in force on said premises on the date of the delivery of said conveyances; second party shall, by written agreement, assume the payment of all orders made on and accepted by first party in the operation of said land; second party shall also, by written agreement, bind himself and his assigns to pay or allow to Thomas J. Steers his rebate on royalty on all ores mined from the 'Laura S.' mine, on mining lots fourteen and fifteen on said land, said

rebate being two and one-half per cent gross on zinc, and five per cent gross on lead; and also to pay or allow to Lively & Company, their rebate of five per cent on all zinc ores cleaned on their tailing mill on said land, said ores being produced by cleaning tailings on their mill.

"Until the payment of the said final sum of eighty-five thousand dollars first party shall continue to operate and mine said land and collect and hold for his own use and benefit, all the rents, revenues and royalties therefrom, as if this agreement had not been made.

"Witness our hands the day and year first above written.    Executed in triplicate.

> "JAMES O'NEILL,
> "F. R. TIBBETS,
> "By C. C. PLAYTER, Agt."

There was also a final agreement entered into on the 2d of May; but not delivered until the first day of June, transferring the lease to Tibbets, in pursuance of the last contract.

Plaintiff testified as a witness. His testimony tends to prove the formal allegations in the petition; his business, his negotiations with respect to the sale and the consummation of the original contract with C. C. Playter. It will be observed that his negotiations, so far as it was necessary to confer about the deal, were with Bruen. There was also other testimony tending to show Bruen's authority to represent O'Neill. Counsel for defendant objected to all conversations or agreements with Bruen, on the ground, they urge, that the evidence was insufficient to show that Bruen was authorized to represent O'Neill. The only testimony introduced by the defendant was the introduction of the defendant himself. That we may fully appreciate the theory of the defense, we here quote the testimony of the defendant:

"*James O'Neill,* sworn as a witness on behalf of the defendant, testified as follows:

"Direct Examination:

"Q. You are the defendant? A. Yes, sir.

"Q. Reside at Webb City—how long have you resided there? A. About eleven years.

"Q. Know Mr. Corder? A. Yes, sir.

"Q. When did you first meet him? A. I think after the first of June on the street car when I was going to Galena.

"Q. That was what year—1899? A. Yes.

"Q. Do you know this man Geddes? A. Know of him.

"Q. He testified here? A. Yes.

"Q. Do you remember seeing him at your house on or about the third of June, 1899? A. Between the second and fifth, in the evening.

"Q. Tell the jury whether or not, at the time he was there at your house, he said to you that if swearing would get this commission they would have it, or words to that effect? A. Words to that effect? He said they would prosecute and I told them they didn't have any case and he said if swearing would get it they would get it. That was Mr. Geddes that testified here this forenoon.

"Q. Did you see any of these parties after this contract was entered into the first of March? A. After the 22d of March?

"Q. Yes? A. I think one of the Playter boys along pretty near the last of April. He asked me something about paying some money and giving them more time. I told him I wouldn't complicate any papers. There was one set of papers out and I would give no others until that time run out.

"Q. What papers did you refer to then? A. The contract I gave them to buy on or before the first of May.

"Q. The contract introduced in evidence? A. Yes, sir, with C. C. Playter or his assigns. That was

the first and the next was made to Frederick R. Tibbets.

"Q. Tell the jury whether or not at any time after this contract was made in March you had any writing with them in regard to extending the time until after the first of May? A. No, sir, I didn't.

"Q. Did you ever agree to extend the time? A. No, sir. Anybody that asked me, if they did ask me, I told them I wouldn't complicate the matter. Would have nothing to do with extending the time until I get the other papers taken up. If they didn't pay that day I would do something else.

"Q. When did you get the papers back? A. The second of May. They were left in the First National Bank of Carterville and were delivered to me. If they paid this $85,000 on or before the first of May they were to be delivered to the other parties; if they didn't they were to be delivered to me. I went over on the second of May and demanded the papers. Mr. Kane wrote on the back of the envelope and handed it to me that it was 9:00 a. m. the second of May.

"Q. Did you ever afterwards promise to pay Corder any commission? A. Never had any conversation with him at all until after June, to my recollection.

"Q. You hadn't met him personally at that time? A. Never met him until after the first of June. Geddes and I had a very little conversation.

"Q. Tell the jury whether at any time you delayed carrying out the original contract for the purpose of defrauding or beating Corder out of his commission or anybody else? A. I did not. I could get more money for the property if they didn't take it.

"Q. You may tell the jury why it was you refused to make any change in the contracts or negotiations during the life of the first contract? A. I didn't want to get mixed up in any law suits, because I had had contracts out before and wouldn't do anything until they were out with any other party. When I agreed

to anything, I held up until that time was out. When these people didn't pay their money in, I supposed it was out. The papers were put in the First National Bank at Carterville, and if they paid the money on or before that date they was to take the papers and if not, I was to take them. If they had paid it that day I give Corder a contract I should pay him $5,000, and would have done it if they had complied with their contract the way the paper read, but they didn't do it and I didn't pay it. I thought if there was anything in papers, why they were to do as the papers said. That is what Mr. Spencer told me. That is what Mr. Spencer told me, that one day was as good as a year and one year as good as a hundred, when it comes to papers.

## " Cross-Examination.

"Q. Did Spencer tell you that? A. Yes, sir.

"Q. Which one? A. Arthur.

"Q. Arthur or the old man? A. Arthur, on the second of the month.

"Q. Were you there at the time he and the old man and yourself had a conversation about this thing? A. Corder?

"Q. Yes? A. Yes.

"Q. Didn't you all have a conversation about it one time about the effect of your making a contract on the second instead of on the first? A. Corder?

"Q. Yes? A. In Spencer's office?

"Q. Yes? A. No, sir.

"Q. There wasn't but one contract out, was there, on this land? A. There was two. One contract to Corder, $5,000.

"Q. That contract and the contract you had to Playter were both dated March 22, 1899? A. That was all that was out at that time.

"Q. Now, when George Playter saw you on the first of May, and wanted to arrange with you or told you about the arrangements he had with Bruen to ex-

tend that time, he was the same man and represented the same party that appeared with you on the second at Spencer's office, wasn't he? A. He spoke to me. Do you want I should tell the conversation? There is too many questions there?

"Q. George H. Playter is the same George H. Playter that saw you on the second of May, is he the same George H. Playter that saw you on the first of May? A. Yes.

"Q. These Playters were the parties you had been dealing with all the time? A. One Playter was the party.

"Q. One or the other? A. One. I was dealing with one.

"Q. You dealt with C. C. Playter first? A. Did all the time.

"Q. The last time you dealt with George H. Playter? A. He came in there and signed papers, I think.

"Q. George H. Playter signed papers, didn't he? A. I thought it was the same man, C. C. Playter.

"Q. This property you were selling, the 'Get There' lease, provided for in the second contract, was the same property provided for in the first contract? A. With them, yes, sir. Only it was different parties.

"Q. Only it was different parties? You were dealing with the same parties? A. No, sir, I was not.

"Q. With the same property? A. Yes.

"Q. And with the Playters? A. Yes, sir, but not—

"Q. Tell me how it is you wanted to get shut first, you say of the contract you had with the Playters regarding this property, and then you went ahead and made the contract with them for the same property? A. To get shut of just such people as you are.

"Q. Of the lawyers? A. Yes, sir, exactly.

"Q. There wasn't any show on earth for a lawsuit if you extended the contract? A. I didn't intend to give any show. I don't think there is any now.

"Q. There wasn't any chance on earth to get into a lawsuit with the Playters? A. Not if I went according to the papers as Spencer told me.

"Q. Don't lay this on Spencer. He has enough to bear himself. I want you to explain to the jury how it is you could get into a lawsuit except with Corder in this transaction if you had extended the original paper of March 22—the contract between Playters and yourself? A. How could I?

"Q. Yes? A. I didn't intend to get into any.

"Q. How could you get into one, I want to know? A. I don't know. Maybe you could study out some way. I couldn't.

"Q. I can't Colonel. As a matter of fact you put this off until after midnight of May 1st, in order to defeat Corder from collecting his commission? A. That is what you say.

"Q. Isn't that what you say? A. No, sir.

"Q. You say you never had any other arrangement regarding this contract before May 2? A. With whom?

"Q. Regarding any other contract? A. No, sir; or wouldn't have.

"Q. Playter saw you over there on May 1st, didn't he? George H.? A. I couldn't tell you what date. A few days before the time run out.

"Q. Did you agree to meet him at Spencer's office the next morning to make the contract? A. No, sir.

"Q. Have any conversation with him about meeting him? A. I told him I was ready to deal with anyone after that contract run out.

"Q. Did you have any arrangement with him to meet him at Spencer's office next morning? A. No, sir.

"Q. How did you happen to go there? A. To see Spencer—my attorneys—to see whether I was doing right or not in taking up the papers.

"Q. How did it happen the Playters met you there

and you entered into these negotiations? A. You will have to ask the Playters.

"Q. You don't know how they came to meet you there? You had no arrangement on the first by which you were to meet them on the second? A. If you ask Spencer, he can tell you. He is attorney for them.

"Q. You didn't have any arrangement to meet them on the second and you don't know why they met you there? A. I didn't go there to see them.

"Q. Did you go there to have this contract drawn up? A. Yes, sir.

"Q. What for? A. Because they were people I thought I could trust on drawing up papers.

"Q. Why did you go there to draw it up if you had no arrangement to draw it up? A. I went there to see if I did right in taking down the first papers. I was there and the other was drawn up. I told them the first was out.

"Q. Did you have any intention of drawing up another contract? A. No, sir, not with them.

"Q. Spencer's office is in Joplin? A. Yes, sir.

"Q. You live at Webb City? A. Yes, sir.

"Q. Were at Webb City on the first? A. Yes, sir.

"Q. Was Playter there in Webb City on the first? A. I saw him there.

"Q. How long was that before the second? A. It wasn't more than a few days before the second.

"Q. You say now you made no arangement with him to meet him after the expiration of that contract? A. I made no arrangement to meet him any place.

"Q. You don't know why you did meet him? A. Only what I told you. I suppose he was in there doing business with them the same as I was.

"Q. Was any other business transacted there between them and the Spencers? A. That I couldn't tell you, because I have generally all I can attend to to attend to my own business.

Vol 176 mo—28

"Q.   Did you have any other business there?   A. I had my business there with them to ask if I was perfectly right in taking up them papers.

"Q.   You had no other business in Spencer's office that day except something connected with the 'Get There' lease?   A.   Perhaps you know.

"Q.   You told me that—probably I don't know as much as you do?   A.   You appear to.   Ask me the question and I will answer it.

"Q. · I understood you to say you had no other business there excepting something connected with the sale of the 'Get There' lease?   A.   That is all I went for on the 2nd, to see whether I done right in taking up the papers.   I am not an attorney.

"Q.   How much did you get as the purchase price out of the sale of the 'Get There' lease?   A.   You mean all the while.

"Q.   Yes.   That is from Tibbets and the Playters? What was the purchase price?   What was received by you from the Tibbets or Playters, or anybody else interested with you?   A.   In the first place I received $5,000.

"Q.   How much afterwards?   A.   $95,000.

"Q.   All together, made $100,000?   A.   Yes.

"Q.   Now, you thought by getting down there on the 2nd, and drawing up this new contract you would relieve yourself of the obligation to Corder?   A.   Why, no, I didn't think a breath about Corder.   I thought the property was worth more and I would get it, which it was.

"Q.   Did you have Mr. Corder in mind?   A.   I didn't think anything about him.   I supposed Mr. Corder was out of it after that date.

"Q.   I believe you said nobody else had any claims on you regarding this property excepting the contracts you speak of of March 22?   A.   Not at any time.

"Q.   You don't know of· any lawsuits that were threatening against you about this matter do you, at

that time? A. No, sir, I wanted to steer clear of them.

"Q. Nobody had threatened you? A. No.

"Q. Playter didn't threaten you? A. They couldn't. They didn't have no show to do it.

"Q. I am asking if they did? A. No, sir; my relations with them was always friendly and with everybody else. I thought like this, if they lived up to the contract, they got the money, according to the papers; if they didn't they wasn't entitled to it. That is the same as to any other papers.

## "Redirect Examination.

"Q. Did you authorize Bruen or anybody else to extend the time or agree to any extension of time on those first papers? A. I do my own business, regardless of Bruen or anybody else when I am able to walk.

"Q. Did you? A. No, sir, if I did, I gave him a paper.

"Q. Something was said here about Bruen attending to this matter prior to the 22nd of March. Where were you then? A. Was at Hot Springs for twenty-five or thirty days. Geddes was mistaken when he said he saw me a few days before that, because I went there the last of February and stayed there until Sunday, the 19th of March, and came to St. Louis and had some business there the next day. That was the 20th, and I got home the 22nd, in the morning.

"Q. After you got home on the 22nd of March, this contract was entered into. Who represented you? A. Didn't anybody represent us."

### OPINION.

FOX, J.—This is a sufficient recitation of the testimony to enable us to determine the controverted questions involved in this cause. We have carefully analyzed the petition in this case, and have reached the conclusion that it states a good cause of action. While the

contract entered into by defendant with plaintiff is the
origin of the cause of action, it is not in fact a suit upon
the contract, but is simply a concise statement of a
cause of action for fraud, alleging the damages sus-
tained by reason of the fraudulent conduct of the de-
fendant.

The contract was an essential ingredient to the
cause of action and is embodied in the statement of it.
The allegations in the third count of the petition, as to
the contract by defendant with plaintiff, for the sale of
this mining lease, and the performance of it by plaintiff,
were necessary in order to place plaintiff in a position
to complain of the fraudulent acts of defendant, which,
it is averred, deprived him of the fruits of his labor, in
the performance of the contract.

The cause of action, as alleged in the third count
of the petition, is not based upon the breach of the ver-
bal agreement by defendant, prior to the expiration of
the original contract, to extend the time of payment of
the balance of the purchase money to the first of June.
In this respect the prayer of the petition, "That by
reason of breach of said verbal agreement and promise
to extend said original contract by defendant, and by
reason of the fraud thereby practiced on plaintiff by
defendant, plaintiff is damaged in the sum of five thou-
sand dollars, for which sum, together with costs, plain-
tiff prays judgment," is misleading. This does not,
however, affect the substantial averments of the peti-
tion, and would not prevent a recovery, upon the true
cause of action stated in the petition. The erroneous
conception of this verbal agreement consists in treating
it as a part of the cause of action, when its only pur-
pose is that of being a part of the evidence which tends
to establish the facts constituting the cause of action.

The substantial allegations of fraud, as charged in
the petition, are in respect to the efforts of the defend-
ant, to have the time expire in which the original con-
tract was to be consummated in order to deprive plain-

tiff of his commission. While the failure to carry out the verbal agreement that on the 1st day of May, he, the defendant, would extend the time for the completion of the trade, would not furnish the basis for a cause of action, yet it was competent and very material testimony, as tending to show how defendant was operating to prevent the consummation of the original contract according to its terms.

This is not an action to enforce the verbal contract referred to in the petition, nor is it an action for the breach of it. We may concede for the purposes of this case, that the verbal agreement, in respect to this mining lease, was not of such a character as could have been enforced or for which an action would lie for the breach of it. Yet we take it that in this action, where all the facts are alleged, and it is charged in effect that the defendant fraudulently prevented the consummation of the original contract, in order to deprive plaintiff of his commission, it was clearly competent to show his entire conduct, his or his agent's verbal agreement, which were calculated to deceive or mislead the contracting parties and prevent them from complying with the first contract.

The Statute of Frauds has no application to the cause of action stated in the third count of the petition.

If the facts are true as averred in the count in the petition upon which this case was tried, it is clear that they constitute a fraud upon the rights of the plaintiff, for which he is entitled to recover damages.

Contracts of the character involved in this litigation, are presumptively entered into in good faith, and it is the province of the courts, in administering the law as to such contracts, to carefully protect the interests of the parties according to the true spirit and meaning of the contract.

Litigation is not uncommon upon this subject; in fact, it has had the attention of the courts of all the States more frequently than most any other. An ex-

amination of the cases will demonstrate most clearly the tendency of all the courts to zealously guard against the efforts of principals to avoid the payment of the legitimate commissions to the broker. It is unnecessary to burden this opinion with the citation of cases. It is sufficient to call attention to the very careful and correct annotation of all the cases on this subject, in Brackenridge v. Claridge & Payne, 43 L. R. A. 593. There you will find but one unbroken line of expression that, "where the broker is the instrument through which the sale has been effected, no sort of artifice, deceit or fraud, will deprive him of his commission."

Appellant very earnestly insists that the testimony as to the conversations and agreement with Bruen was incompetent, on the ground that no sufficient evidence was introduced, showing his authority to represent the defendant. Counsel for appellant very ably and logically present that question. Will say, however, we have carefully examined all the evidence disclosed by the record on that subject. It must be noted that the first negotiation in respect to this property was had by the plaintiff with Bruen. C. C. Playter, in whose name the original contract was made, negotiated and talked with Bruen. George Playter, who testified as to the verbal agreement, negotiated with Bruen. This, in connection with the testimony of James I. Geddes, certainly was sufficient to at least submit that question to the jury.

Witness Geddes testified upon that particular subject as follows:

"Q. Are you acquainted with Mr. Bruen? A. Yes.

"Q. What relation is he to Col. O'Neill? A. Son-in-law.

"Q. Now what conversation, if any, did you have with Col. O'Neill, regarding Mr. Bruen's authority to act for him. State what it was in this matter? A. He

said anything I had to communicate or any act of Bruen was his act. Mr. Bruen done his business.

"Q. Was that with reference to this transaction? A. Yes, sir."

There was a sufficient showing to submit the questions to the jury and they were the triers of the facts and had the right to weigh the testimony and determine the fact, as to the authority of Bruen to represent the defendant.

This brings us to the complaint of the appellant, in respect to the instructions of the court, upon submitting this case to the jury.

The instructions for the plaintiff were as follows:

"1. The court instructs the jury that under the contract read in evidence dated March 22, 1899, the defendant agreed to pay plaintiff the sum of five thousand dollars if the terms and conditions therein expressed were complied with by C. C. Playter or his assigns. You are further instructed that if you find from the evidence that during the life of this contract, that is to say, on or before May 1, 1899, it was agreed between C. C. or George H. Playter, acting in that behalf, for Frederick R. Tibbets, of Boston, Massachusetts, if you find they were so acting, and the defendant, James O'Neill, by himself, or through his agent, George H. Bruen, if you find said Bruen was defendant's agent, and authorized to act for him in reference to the matter, the time for the completion of the purchase of the 'Get There' lease, from the defendant by said Tibbets would be extended, provided the sum of ten thousand dollars was paid defendant on or before May 1, 1899, and that said Tibbets was able and willing to comply with the contract read in evidence, dated March 22, 1899, and would have done so, had it not been for such agreed extension, if you find such extension was agreed upon, and the defendant refused to grant such extension on the first day of May, 1899, but agreed to make a contract with them on the next day, and thereupon

. did make the contract read in evidence dated May 2, 1899, and if you further find from the evidence that defendant's delay in making the last-named contract until after the first day of May was for the purpose or with the intention or design of relieving himself from his obligation to pay plaintiff his commission as agreed upon, or was done with the design or intention on his part of depriving plaintiff of his commission for the sale of said lease, then you will find the issues for the plaintiff and assess his damages at the sum of five thousand dollars, together with interest thereon at the rate of six per cent per annum from the time demand was made by plaintiff upon defendant for such commission, if you believe from the evidence such demand was made.

"2.    The court instructs the jury that if you find from the evidence that the defendant, James O'Neill, authorized one George H. Bruen to act for him and to agree with Playter for an extension of the time in which to comply with the contract of March 22, 1899, read in evidence, then in that event an agreement to that effect made by said Bruen would be binding on defendant to the same extent as if made by himself personally."

Instruction numbered 1 is erroneous. This, as before stated, is an action for damages induced by the fraudulent acts and conduct of defendant. While the contract fixing the amount of commission was competent evidence for the jury to consider in measuring the damages to be awarded, yet the jury had the right to estimate the damages and so state in their verdict. The error of this instruction in that respect is in the fact that the court tells the jury that if they find a certain state of facts, they will assess the damages at $5,000. This count is not an action on the contract, and the contract, under the law of this case, can not definitely fix the amount of damages. This instruction should have told the jury, if they find for the plaintiff, they should assess his damages at such amount as they may believe

from the evidence he is entitled to, not exceeding the sum of $5,000. It was also error to have the jury assess as damages any interest. The damages in this case are unliquidated. No interest is claimed in the petition. This instruction should have also omitted special reference to the verbal agreement as between Playter and Bruen. While this was material and most important evidence as to the perpetration of the fraud complained of in the petition, yet it ought not to be singled out and made the entire basis for the recovery.

The issues, by an appropriate instruction, should be clearly defined. The jury's attention should be called to the contract of plaintiff with defendant, for the sale of the mining lease, as it is in the first part of the instruction. This should be followed by directing their attention to the contract entered into by C. C. Playter, for Tibbets, with defendant, purchasing the mining lease, and requiring them to find that plaintiff, under his contract with defendant, brought about this sale; then followed with the requirement to find, by reason of the fraudulent acts and conduct of defendant, the action of consummating the first contract was deferred and prevented by defendant, until the 2nd day of May, with the fraudulent intent and design of depriving plaintiff of his commission.

The foregoing is not to be construed as a form for an instruction; but simply as a suggestion as to the features that should be embodied in one, so as to render it unobjectionable.

Instruction numbered 2 is erroneous, because it is calculated to mislead the jury, as to the true purpose of the testimony, as to the verbal agreement by Bruen to extend the time in which to comply with the contract. That testimony, as before stated, is admissible only for the purpose of establishing the charge of fraud alleged in the petition. It is for the purpose of showing the efforts of defendant to mislead the contracting parties, and then when the time comes to act, refuse to act and,

by that method, prevent the consummation of the first contract.

The cause of action on trial does not require the jury to find that the agreement with Bruen, as the agent of defendant, was a binding contract, and one that could be enforced.   The concluding part of that instruction which tells the jury "then and in that event, an agreement to that effect made by said Bruen would be binding on defendant to the same extent as if made by himself personally," should be left out, and in lieu thereof might be added—"Then and in that event, the acts and conduct of Bruen, in respect to such agreement, will be construed to be the acts of the defendant, and the jury may take into consideration such facts in determining the issues in this cause."

With this modification, the first instruction clearly defining the issues, the jury would be advised as to the application of the testimony as to the issues, and not misled into the belief that the court was directing them to find the agreement a binding contract upon the defendant.

We have examined the record and have reached the conclusion that if the plaintiff, in pursuance of his contract with defendant, brought about the sale of the mining lease, as indicated by the first contract with C. C. Playter, and that defendant by misleading the contracting party, and by his fraudulent acts and conduct, prevented such sale being consummated, on the 1st of May, and designedly deferred the final completion of the sale until the second of May, in order to deprive plaintiff of his commission, he is liable in this action.   This is substantially the cause of action set forth in the third count of the petition.

The discussion of the errors in the instructions given at the instance of plaintiff indicate clearly the views of this court as to the issues which should be submitted in the declarations of law, upon a re-trial of this case, hence, it is unnecessary to review the contentions

as to the instructions for the defendant, and modification of them, by the court.

For the errors as indicated, by the views herein expressed, the judgment will be reversed and the cause remanded.

All concur.