Deborah LEDERLE,
Plaintiff/Respondent,

v.

Robert J. LEDERLE, III and Christina Marie Lederle, Defendants/Appellants.

No. 68141.

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 20, 1996.

B. Michelle Ward, Peper, Martin, Jensen, Hetlage & Maichel, St. Louis, for appellants.

John C. Garavaglia, Raskas, Ruthmeyer, Pomerantz & Wynne, St. Louis, for respondent.

GARY M. GAERTNER, Judge.

Defendants/appellants, Robert J. Lederle, III and Christina Marie Lederle ("children"), the children of Robert J. Lederle, Jr. ("decedent"), appeal from the judgment of the Circuit Court of St. Louis County entered after a two-day bench trial, finding plaintiff/respondent, Deborah Lederle ("wife"), decedent's surviving spouse, the sole owner of decedent's individual assets (collectively, "the disputed property"):

1. Fifty shares of Lederle Machine Company ("LMC") stock represented by Certificate No. 1, constituting one-half ownership of LMC.

2. 438 East Clinton, Kirkwood, Missouri ("the Clinton property"), where LMC is located and from which it conducts its business.

3. A promissory note from LMC to decedent in the original principle amount of $36,937.58.

4. Certain accounts receivable held by decedent pursuant to an agreement regarding the sale of another company.

5. A 1986 Chevrolet Silverado pick-up.

We affirm.

The following was adduced at trial: Decedent and wife married in 1983. This was decedent's second marriage. Children were born of decedent's first marriage. Decedent petitioned for and eventually obtained custo-

dy of children, who lived with him and wife for about five years prior to decedent's death in 1992.[1]

LMC was a business started by the parents of decedent and his sister, Mary Lou Brickey ("sister"). Decedent and sister each inherited one half of LMC upon their father's death. Decedent and sister incorporated LMC in 1989, issuing fifty shares of LMC to decedent via Certificate No. 1 and fifty shares to sister via Certificate No. 2. Also, decedent and sister each inherited one half of the Clinton property (the Clinton property was not owned by the corporation). Decedent and sister ran LMC as joint owners. Wife worked for LMC as a clerk, earning $500 per week.

In 1990, differences arose between decedent and sister concerning the operation and direction of LMC. Relations worsened in November of that year, when sister's husband, an employee of LMC, struck decedent and was fired. Wife testified at trial that subsequent to this incident, while she was off work due to surgery, she and decedent discussed a potential buyout of sister's share of LMC. According to wife, decedent proposed that wife take over sister's duties (i.e., bookkeeping) and run the company with him as a co-owner. Wife testified to her understanding she would not become a co-owner until decedent had completed the buyout of sister. Wife agreed to assume the expanded duties and responsibilities co-ownership and management entailed, for which she would be paid an additional $200 per week. This agreement was referred to by the parties and the trial court as "the first agreement." Wife also agreed to utilize marital funds and property to further the business; earlier that year—prior to this agreement—decedent and wife refinanced a lake home they jointly owned and put the money into LMC.

Wife returned to work in December 1990, but since no agreement between decedent and sister had been reached as to a possible buyout, wife resumed her old duties as clerk. However, on July 16, 1991, decedent relieved sister of her duties with LMC. That same day, according to wife, she and decedent agreed to implement the first agreement, pursuant to which wife assumed the duties of a co-equal owner and operator of LMC.

Wife testified she and decedent wanted to completely buy out sister's share of LMC and the Clinton property, but did not possess sufficient funds. LMC also needed a line of credit for operating capital. To accomplish these goals, decedent and wife determined bank financing was necessary. According to wife, she and decedent entered into another agreement—referred to by the parties and the trial court as "the second agreement"—wherein wife agreed to co-sign on bank loans for the financing they needed and decedent, in return, agreed to place all his property into joint names with wife as tenants by the entirety. Decedent and wife thereafter applied to Heritage Bank for a loan, but were unsuccessful.

In early February 1992, decedent and wife met with Doug Dischinger, an agent for LMC's insurer, Rea Insurance Agency, to review LMC's coverage. Decedent told Dischinger he and wife were to be joint owners of LMC and the Clinton property upon completion of the impending buyout of sister. Dischinger noted LMC's policy would require an endorsement showing decedent and wife as additional named insureds. Decedent told Dischinger to wait until after the buyout to issue the endorsement. Dischinger's notes of the meeting state in part, "Show [wife] + [decedent] as Building owners, additional insured after Buyout. . . ." LMC's insurer later issued an endorsement showing decedent and wife as the owners of the Clinton property.

On February 11, 1992, decedent entered into a non-financed buyout agreement with sister. No bank financing had been obtained as of this date. Pursuant to this agreement, LMC purchased sister's shares in LMC and executed a promissory note to sister, guaranteed by decedent. Also, decedent purchased sister's undivided one-half interest in the Clinton property in exchange for certain real estate and a promissory note executed by

---

1. At the time of the trial court's judgment, son was an adult and daughter was seventeen years old.

decedent, secured by a first deed of trust on the Clinton property, which wife co-signed.

Decedent and wife continued to seek financing in order to completely pay off sister. In late February 1992, the couple applied to Commerce Bank for a loan. Decedent completed a personal financial statement in connection with the joint loan application, in which he listed the ownership of LMC as "joint" and listed the Clinton property as titled in both his and wife's names. This application was unsuccessful.

Decedent and wife then applied to Southwest Bank for a loan. In April of 1992, decedent and wife met with Donna Kirtian (f/k/a Donna Bernhard), a loan officer for the bank, to discuss a possible loan. Kirtian testified to her understanding that LMC was run by the couple as a joint effort and that decedent and wife jointly owned LMC and the Clinton property; otherwise, according to Kirtian, she would have discussed a possible marital waiver with the couple.

Decedent and wife submitted to Southwest Bank the same personal financial statement they had submitted to Commerce Bank. This time they were successful: Southwest Bank approved a personal loan of $110,000 to decedent and wife as joint borrowers, and a credit line of $50,000 to LMC with decedent and wife as co-guarantors. In a file memorandum dated July 1, 1992, Donna Kirtian stated she

> agreed to extend a $110,000 real estate loan to [decedent] & [wife] and a $50,000 line of credit to [LMC].... The proceeds from the real estate loan will be used to buy out [decedent]'s sister who is a half owner of the company.... This is a growing company and *its owners* are very knowledgeable about the business....

(emphasis added.) According to Kirtian, the memorandum's use of the term "owners" in the plural was intentional, and referred to decedent and wife.

On July 14, 1992, decedent and wife co-signed the following loan documents with respect to the $50,000 credit line:

—A continuing unlimited guaranty agreement making decedent and wife jointly and severally liable on the credit line and

granting Southwest Bank the right to proceed against either spouse irrespective of the death of the other.

—A subordination agreement postponing repayment of loans made to LMC until after repayment of Southwest Bank's loans.

On July 22, 1992, decedent and wife co-signed the following loan documents with respect to the $110,000 loan:

—A deed of trust note making decedent and wife jointly and severally liable on the loan and listing the Clinton property as security for the loan.

—A recorded deed of trust upon the Clinton property referring to decedent and wife as grantors.

—A conditional assignment of rentals referring to decedent and wife as owners of the Clinton property.

—A financing statement referring to decedent and wife as debtors.

—A security agreement referring to decedent and wife as debtors.

—A statement sheet authorizing the disbursement of the loan proceeds to sister.

Wife testified she and decedent owned LMC when they were completing the above loan documents. However, in deposition testimony entered into evidence, wife stated decedent and sister were the owners of LMC while these documents were being signed and remained owners until the financing was obtained and the buyout of sister was completed.

Sister was finally and completely bought out by means of a July 25, 1992, cashier's check issued by Southwest Bank. Thereafter, decedent and wife were listed as joint owners of LMC on the titles to two motor vehicles acquired for the company, and were listed as creditors of LMC on a subordination agreement entered into as part of an equipment lease.

The following additional testimony was heard at trial:

—Charles Rossi, wife's brother, testified he told wife in the summer of 1992 that if her name was on the loan papers, she and decedent should draw up an agreement in

which she would be part owner of the company; in response, wife told Rossi she and decedent "were talking about that."

—Greg Sims, a sales representative for LMC, testified decedent told him all ownership of LMC was to go to decedent and wife after sister was bought out.

—William Reichard, general manager for LMC, testified decedent told him he and wife jointly owned LMC; Reichard also noted wife became more involved in the everyday activities of LMC and acted as a co-owner after sister left the company (in July of 1991).

—Donna Mullersman, a friend of wife and decedent, testified about a meeting she had with the couple in February of 1992, during which decedent stated he and wife had just bought sister out, and were now the owners of LMC. Mullersman also recounted a meeting in the summer of 1992 at which decedent again stated he and wife were the sole owners of LMC, and that everything would be wife's upon his death.

—Charles Schomber, a sales manager for LMC, testified to a conversation he had with decedent about a week before decedent's death in which decedent made comments that, to Schomber, implied decedent intended wife to become owner of LMC upon decedent's death. Schomber also testified to his belief, as a result of this conversation, that decedent was a "100 percent owner" of LMC at that time.

Decedent died intestate on November 11, 1992, at age 43. Wife discovered after his death that the disputed property was titled in decedent's name only.

Wife assumed control of LMC's operations upon decedent's death. Wife attempted to purchase decedent's son's interest in LMC several months later, but son refused.

On July 23, 1993, wife filed the underlying action against children. Wife's petition consisted of three counts. In count I, wife sought specific performance of the alleged oral agreement between herself and decedent to put the disputed property into their joint names as tenants by the entirety. In count II, wife alleged decedent's failure to put the disputed property into their joint names con-

stituted a constructive fraud and asked that a constructive trust be imposed. In count III, wife asked the court to enforce the alleged agreements as a joint venture agreement between herself and decedent. Children raised the statute of frauds as an affirmative defense to each count.

On February 27, 1995, the trial court entered judgment in favor of wife on counts I and II, and dismissed count III as moot. The court specifically resolved all issues of credibility in favor of wife and against children. The court found, *inter alia:*

— The second agreement superseded the first agreement.

—Wife fully performed the agreement by incurring liability on the personal loan and the credit line, by executing any and all documents necessary to obtain the personal loan and the credit line, and by distributing the proceeds of the personal loan to sister.

—Evidence of the agreement between decedent and wife, the statements of decedent regarding their ownership of the property, and wife's full performance of the agreement, was uncontradicted.

—There was no inconsistency in wife's testimony as to the existence or the terms of the agreements, and the date on which wife was to become the joint owner of the disputed property was not fixed but was contingent (as testified to by wife) upon completion of the bank financing.

—Wife's actions were cogent evidence of the agreements between her and decedent, and the terms of these agreements were proven by clear, cogent, unequivocal and convincing evidence.

—Wife reasonably relied on decedent to perform his obligations under the agreement by putting the property in their joint names as tenants by the entirety.

—Wife's attempt to buy decedent's son's interest in LMC was not an admission there were no agreements between wife and decedent, but rather "resemble[d] settlement discussions more than admissions."

—Decedent's failure to add wife's name to the title to the above property irreparably injured wife.

The court accordingly ordered title to and/or possession of all the disputed property delivered to wife, to the exclusion of children.[2] This appeal followed.

Children raise two points on appeal. In their first point, children challenge the trial court's judgment declaring wife the sole owner of (1) the fifty shares of LMC represented by Certificate No. 1, and (2) the Clinton property. Children claim the statute of frauds barred enforcement of the alleged oral agreements between decedent and wife as to these two items of the disputed property. We disagree.

We initially note the parties dispute whether the trial court rendered judgment on both wife's action for specific performance (count I) and on her action for imposition of a constructive trust (count II). Children contend the court rendered judgment on the specific performance count only. Wife claims the court entered judgment on both counts, its judgment can be affirmed on either ground, and children abandoned any challenge to the judgment regarding constructive trust. We need not resolve this controversy, as we find the judgment can be affirmed on the specific performance ground.

■■■ The statute of frauds ordinarily bars the enforcement of an oral contract to convey land[3] or securities[4] unless application of the bar would work a fraud. *Holtmeier v. Dayani*, 862 S.W.2d 391, 400 (Mo.App.E.D.1993); *Straatmann v. Straatmann*, 809 S.W.2d 95, 98 (Mo.App.E.D.1991). This equitable exception requires the party seeking enforcement of the contract to prove, at a minimum, (1) the performance of acts which constitute cogent evidence of the existence of the contract, (2) the terms of the contract by means of clear, cogent, unequivocal and convincing testimony, and (3) such a change in the party's position as a result of the acts

done in reliance on the contract, that to permit the other party to avoid enforcement of the contract would result in a gross injustice. *Pointer v. Ward*, 429 S.W.2d 269, 273 (Mo.1968). More specifically, courts require the party seeking enforcement to establish, *inter alia*, the following:

1. A clear, explicit, and definite contract exists.

2. The contract is proven as pleaded.

3. The contract is not established by conversations too ancient on one hand, or too casual on the other.

4. Proof of the contract is such as to leave no reasonable doubt in the mind of the chancellor that the alleged contract was in fact made and that full performance of the contract has been had.

5. The acts constituting performance are solely referable to the contract pleaded and are not such as to be reasonably referable to some other contract.

*Walker v. Bohannan*, 243 Mo. 119, 147 S.W. 1024, 1028–1029 (1912); *Gegg v. Kiefer*, 655 S.W.2d 834, 837 (Mo.App.E.D.1983). This exception is rigidly scrutinized and sparingly invoked; relief will be denied if there is doubt as to whether there has been a meeting of minds or full understanding of the terms sought to be enforced. *McKenna v. McKenna*, 607 S.W.2d 464, 468 (Mo.App.E.D. 1980).

Children contend wife failed to prove the existence of such a clear, explicit and definite agreement between herself and decedent to place the LMC stock and the Clinton property into their joint names, as to leave no reasonable doubt an agreement was in fact made. Children further contend wife failed to prove her performance was solely and unequivocally referable to such an agreement.

■■■ Children's point is well taken with respect to the first agreement, under which wife claimed she was made a co-owner of

---

**2.** If the agreement alleged by wife was not enforced, under the rules of intestate succession children would receive half the property. *See* RSMo §§ 474.010(1)(d), (2)(a). All statutory references are to RSMo 1994 unless otherwise indicated.

**3.** *See* RSMo § 432.010.

**4.** *See* RSMo § 400.8–319.

LMC in exchange for assuming sister's duties upon sister's expulsion from LMC and for agreeing to utilize marital funds and property to further the business. Assuming there was sufficient proof of the existence and terms of the first agreement, wife failed to prove her performance was solely referable to it. Wife's assumption of the additional responsibilities of management and operation of her husband's business could just as reasonably be explained with reference to the marital relationship, *see Pelsue v. Pelsue,* 367 S.W.2d 487, 491 (Mo.1963), and the increase in pay she received. We also note wife had agreed to use marital property on LMC's behalf prior to the first agreement, i.e. the funds obtained by refinancing the couple's lake house. As wife's performance under the first agreement was not solely referable to that agreement, we find it does not come within the equitable exception to the statute of frauds outlined above.

■ We now turn to the second agreement, which the trial court found superseded the first. Wife testified that under the second agreement, decedent promised to put the disputed property (including the LMC shares and the Clinton property) into joint names as tenants by the entirety in exchange for her co-signing the loan and credit line documents.

■ The loan documents admitted into evidence clearly and unambiguously show wife fully performed this agreement by signing the appropriate documents, thereby assuming joint and several liability on a $160,000 debt. The statute of frauds is not applicable to contracts which have been fully performed by one of the parties. *Holtmeier,* 862 S.W.2d at 400; *Straatmann,* 809 S.W.2d at 99; *Leh v. Dyer,* 643 S.W.2d 65, 68 (Mo.App.E.D. 1982). Nevertheless, children contend wife failed to prove the existence or terms of the second agreement by clear, explicit, and definite evidence, and failed to prove wife's performance was solely referable to the second agreement. In arguing wife failed to prove the existence or terms of the second agreement with the requisite clarity, children point to alleged inconsistencies in the evidence and the trial court's judgment, such as wife's deposition testimony wherein she stated sister, not wife, was a co-owner of LMC while the loan documents were being signed; Charles Rossi's testimony that wife told him in the summer of 1992 she and decedent merely talked about making her a part owner of LMC; Charles Schomber's belief decedent was a "100 percent owner" of LMC when he talked to him shortly before decedent's death; and Donna Kirtian's statement in the July 1, 1992, file memorandum that sister, not wife, was a half owner of the company.

These inconsistencies do little to detract from the otherwise abundant evidence of the second agreement. Viewing the evidence as a whole, and deferring to the trial court on matters of credibility, we find the evidence adduced at trial—wife's uncontradicted testimony as to the existence and terms of the second agreement; the corroboration provided by other witnesses' testimony; the loan documents listing wife as co-guarantor and creditor of LMC and owner of the Clinton property; wife's individual personal liability on the loans and her assumption of the management of LMC upon decedent's death—sufficed to prove the existence of the second agreement.

■ Children also argue wife failed to prove material terms of the second agreement, particularly the precise subject matter of the agreement and what "co-ownership" of the property meant. However, wife testified the agreement referred to *all* the disputed property. We additionally note co-ownership of property by a husband and wife creates a presumption of tenancy by the entirety. *Seabaugh v. Seabaugh,* 839 S.W.2d 49, 50 (Mo.App.E.D.1992). We find the terms of the second agreement sufficiently clear and definite to merit the agreement's enforcement.

Finally, children contend wife's co-signing of the loan documents was not solely and unequivocally referable to the second agreement, but was equally referable to her seeking to protect her marital interest in the disputed property. Children point out wife signed the 1992 refinancing of the couple's lake home, which was used as a means to put cash into LMC, without a similar agreement.

However, the lake home was jointly owned. LMC and the Clinton property were titled in decedent's name only. Wife was not required, as a spouse or otherwise, to act as co-signor of the personal loan or co-guarantor of the credit line and thereby become individually liable on a cumulative $160,000 debt taken out against decedent's individual property. The reasonable explanation for wife's doing so was her reliance on the second agreement. In the absence of this agreement, wife would have assumed complete liability for loans taken out against property in which she, as surviving spouse, would have only a half interest. Wife's co-signing the loan documents and assumption of joint and several liability on the loans was solely and unequivocally referable to the second agreement.

In sum, we find wife adduced sufficient evidence at trial to support the trial court's enforcement of the second agreement. Point denied.

■ For their second point on appeal, children contend the evidence at trial was insufficient to support the trial court's finding that wife was owner of the other three items in the disputed property: the $36,937.58 promissory note from LMC to decedent, the accounts receivable held by decedent regarding the sale of another company, and the Silverado pick-up. Both parties agree the statute of frauds does not apply to these three items. Children argue wife failed to prove, by a preponderance of the evidence, the existence of an agreement in which decedent agreed to put these items in joint names as tenants by the entirety.

We disagree. Wife testified, without contradiction, that decedent promised to put *all* his assets into their joint names as tenants by the entirety if wife co-signed on the loan documents. The trial court specifically found wife's testimony credible; we defer to this finding. Rule 73.01(c)(2). We see no error. Point denied.

The judgment of the trial court is affirmed.