**John F. MIKA, et al., Appellants,**

v.

**CENTRAL BANK OF KANSAS CITY, et al., Respondents.**

**No. WD 61116.**

Missouri Court of Appeals,
Western District.

May 30, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 1, 2003.

Application for Transfer Denied
Aug. 26, 2003.

Theodore C. Beckett, III, Kansas City, MO, for appellants.

David W. White, Terry J. Brady, Kansas City, MO, for respondents.

Before JOSEPH M. ELLIS, Chief Judge, EDWIN H. SMITH, Judge and VICTOR C. HOWARD, Judge.

JOSEPH M. ELLIS, Chief Judge.

Appellants, John Mika, Brigid Mika and Venus Automotive, Inc., owned two parcels of land in Kansas City, Missouri. Respondent Central Bank of Kansas City ("Central Bank") was the holder of certain promissory notes secured by the properties. After Appellants stopped paying the amounts due on the notes, Central Bank initiated foreclosure proceedings. Central Bank purchased both properties at the foreclosure sale and sold one of the properties to Respondent University Health Services ("UHS"). Following this sale, Appellants filed a petition against Central Bank, UHS, and several officers and board members of Central Bank and associates of UHS. Appellants alleged that Respondents conspired to fraudulently induce Appellants to stop servicing the debt on the notes in order to effectuate a sale of Appellants' property to UHS. The trial court granted summary judgment for Respondents, holding that Appellants' claims were barred by the Statute of Frauds. This appeal follows.

When reviewing the grant of summary judgment, we view the record in the light most favorable to the nonmoving party and accord them the benefit of all reasonable inferences. *Dwyer v. Meramec Venture Assocs., L.L.C.*, 75 S.W.3d 291, 293 (Mo. App. E.D.2002). Viewed in this manner, the record reveals that Appellants owned two properties in Kansas City, Missouri: 1615 Independence Avenue and 615 Highland in the northeast part of Kansas City, Missouri ("Independence Avenue property") and 1316, 1318, and 1320 Grand Avenue (the "Grand Avenue property").

John Mika was the president of Venus Automotive, which was dissolved in November 1996. Appellants had a longstanding business relationship with Central Bank. Steven Morgan, Vice President of Central Bank and a board member, was Appellants' primary contact at the bank. Central Bank was the holder of certain promissory notes for $375,000 and $65,000

that were secured by deeds of trust on both the Independence Avenue and Grand Avenue properties. Venus Automotive had financial difficulties and filed for bankruptcy in May 1998.

In November 1998, UHS made an offer to purchase the Independence Avenue property for $450,000. Mika refused and made a counteroffer of $600,000. UHS made a counteroffer of $500,000. Mika did not accept the offer.

In December 1998, Appellants entered into a real estate contract with Joseph Saitta for the sale of the Grand Avenue property for $200,000. Saitta secured financing, and Appellants wanted to sell the land at the agreed price; however, the title search process revealed several liens concerning the property, and Saitta informed the Appellants that these liens would have to be resolved before the sale could be completed.

Appellants discussed the title issues with Morgan, and he suggested that a "friendly foreclosure" was the appropriate way to resolve the title issues and complete the sale. Morgan suggested that if Appellants stopped servicing the indebtedness on the notes, Central Bank would foreclose and take title to the properties. Central Bank would then complete the sale of the Grand Avenue Property to Saitta for $200,000 and would sell the Independence Avenue property back to Appellants for the amount Central Bank paid for the properties at the foreclosure sale, less the $200,000 received from Saitta.

As part of the agreement, Appellants were to secure financing to buy the Independence Avenue property back from Central Bank. Had it not been for the "friendly foreclosure" agreement, Appellants would have continued paying the amounts due on the notes or obtained other arrangements to prevent foreclosure. Morgan denied ever proposing such an agreement.

Appellants stopped paying the amounts due on the notes, and there was a foreclosure sale in April 1999. At the sale, Central Bank purchased both properties for about $516,000.

At a May 19, 1999 meeting of the board of directors, Central Bank approved the sale of the Grand Avenue property to Saitta for $200,000 and the sale of the Independence Avenue property to UHS for $500,000. During the time of these transactions, the board of directors of Central Bank included Dana and Morgan. The board also included Karen Pletz, president of UHS, Chief Executive Officer of the University and a member of the Board of Trustees of the University; and Ross J. Cascio, the sole owner of the Victor Ross Realty Company, the realtor involved in the sale of the real property in question. In addition, James Hoffine, who was involved in the acquisition of the property, was the Vice–President for Finance and Administration for UHS as well as the President and a board member of Independence Avenue Development ("IAD"), a not-for-profit corporation that supports the University in acquiring property. Cascio and Pletz abstained from voting on the sale of the property to UHS.

On May 26, 2000, Appellants filed their second-amended petition against Central Bank, UHS, IAD, Morgan, Dana, Pletz, Cascio and Hoffine. Appellants raised the following claims in their petition: Count I—Common Law Fraud; Count II—Negligent Misrepresentation; Count III—Breach of Contract; Count IV—Specific Performance; Count V—To Set Aside Foreclosure; and Count VI—Civil Conspiracy. Subsequently, Respondents filed their separate answers. On August 20, 2001, Respondents filed motions for summary judgment. On September 10, 2001,

Appellants filed responses in opposition to motions for summary judgment. On December 11, 2001, the trial court entered its order granting summary judgment in favor of all Respondents. On February 29, 2002, the trial court denied Appellants' motion to reconsider. This appeal follows.

> Appellate review of a summary judgment is essentially de novo. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo.banc 1993). When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered. *Id.* To prevail on a motion for summary judgment, the movant must establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Id.* at 377.
>
> The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. *ITT* at 376. The propriety of summary judgment is purely an issue of law. *Id.* As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment. *Id.*

*Glasgow v. Cole*, 88 S.W.3d 114, 115 (Mo. App. E.D.2002).

Respondents claimed in their motions for summary judgment that Appellants' claims were barred by the credit agreement statute of frauds, § 432.045.[1] Respondents UHS, Hoffine and IAD also claimed that Appellants' claims were barred by the statute of frauds for the sale of real property, § 432.010.

In its judgment, the trial court made the following findings:

1. The plaintiffs had an ongoing business relationship with Central Bank. That relationship involved the borrowing of moneys that were secured by the property in question.

2. There clearly exists a genuine issue of fact as to whether or not there was a friendly foreclosure agreement. To be sure, there is evidence that such oral representations did occur. The bank and Mr. Morgan deny the same. This evidence includes not only the testimony of the plaintiffs, but at least indirect testimony from other individuals that had contact with the plaintiffs. In particular, the moving papers suggests [sic] that the plaintiffs had told several other business associates or creditors of this friendly foreclosure agreement.

3. The friendly foreclosure agreement was not the subject of any writing.

4. There is no direct evidence that anyone other than Morgan and possibly Mr. Dana had knowledge of this proposed or alleged friendly foreclosure agreement.

5. The plaintiffs John and Brigid Mika signed a credit agreement with Central Bank that included the following language in bold-face 10–point type in paragraph 12:

> Oral agreements or commitments to loan money, extend credit or to forbear from enforcing repayment of a debt including promises to extend or renew such debt are not enforceable. To protect you (borrower) and us (lender) from misunderstanding or disappointment, any agreements we reach covering such matters are contained in this writing, which the complete and exclusive statement of the

---

**1.** All statutory references are to RSMo 2000 unless otherwise noted.

agreement between us, except as we may later agree in writing to modify it.

The trial court also determined that the "friendly foreclosure" agreement constituted a financial accommodation pursuant to § 432.045, the statute of frauds for credit agreements.

The court went on to conclude that even if the count of civil conspiracy was not barred by the statute of frauds, "there is simply no evidence that defendants Pletz, Hoffine, Cascio, UHS and IAD had knowledge of the friendly foreclosure agreement, nor that the purpose of the agreement was to defraud the plaintiffs of the property." Accordingly, the court determined that summary judgment was appropriate on the conspiracy counts as to those defendants, but not defendants Morgan, Dana, and Central Bank.

The trial court also indicated that it believed that Respondents' conduct might warrant the application of an equitable exception to the statute of frauds, but that it was not sure if such an exception applied to the credit agreement statute:

This Court sustains defendants' summary judgment motion in favor of all the defendants with substantial reluctance. The Court finds that there is clearly evidence that a fact-finder could use to find that there was an oral friendly foreclosure agreement and that there was a breach of such an agreement by defendants Morgan and Central Bank, and possibly defendant Dana.

The existence of the friendly foreclosure agreement is established by the testimony of John and Brigid Mika. Furthermore, the material supplied to the Court reveals several other individuals who had contact with the plaintiffs to whom the Mikas indicated the existence of this oral agreement.

It should be noted that Mr. Morgan on behalf of Central Bank strongly contends that he never made such an agreement. This is a classic kind of issue that a fact-finder, especially a jury, is well equipped to resolve. Chapter 432.045 is a broad statute. Clearly the friendly foreclosure agreement involved in this cause would come under that statute as a "financial accommodation." *The critical issue is whether or not the conduct in this case merits some kind of fraud exception to § 432.045 to prevent substantial injustice, thus having this cause survive summary judgment. After much soul searching the Court believes that the existing legal precedent requires that this inquiry be left to the appellate courts.*

If this Court was governed only by notions of basic fairness, much of this lawsuit would survive summary judgment. However, this Court is a judicial officer whose duty is to follow the law and the policy enforced by the legislature, rather than being a policymaker itself. (emphasis added).

■ Appellants argue in point one that the trial court erred in determining that the credit agreement statute of frauds, § 432.045, barred all of their claims because their claims "have nothing to do" with a credit agreement, the extension of credit or a financial accommodation. Rather, they contend that the basis for their claims is Central Bank's misrepresentations to Appellants regarding their agreement to sell certain real property to Appellants after the "friendly foreclosure" was completed. Alternatively, Appellants assert that Central Bank's fraudulent conduct precludes Central Bank from using § 432.045 as a defense.

The trial court relied on two United States District Court cases [2] in ruling that

2. *Horseshoe Entm't, L.P. v. Gen. Elec. Capital* *Corp.*, 990 F.Supp. 737 (E.D.Mo.1997) and

Appellants' claims were based on an alleged financial accommodation and were, therefore, barred pursuant to § 432.045.[3] We, of course, are not bound by either of those cases. *Godat v. Mercantile Bank of Northwest County*, 884 S.W.2d 1, 4 n. 1 (Mo.App. E.D. banc 1994). But we need not decide that issue because we conclude that the fraud exception to the general statute of frauds, § 432.010, applies with equal force to the credit agreement statute of frauds, § 432.045. Consequently, even if the agreement in the case at bar constituted a "financial accommodation" pursuant to § 432.045, the trial court erred in granting summary judgment because it misstated and misapplied the law when it found that the fraud exception did not apply to the credit agreement statute of frauds, § 432.045.

■ Equitable exceptions to the Statute of Frauds are well established under the common law of this State. They generally fall into three broad categories:

(a) to prevent perpetration of a fraud by application of the bar of the statute;

See *Walker v. Bohannan*, 243 Mo. 119, 147 S.W. 1024, 1028 (1912) (noting that equitable exceptions to the Statute of Frauds began developing after it "became apparent to courts of conscience that frauds were being perpetrated under the strict letter of the statute"); *In re Estate of Conkle*, 982 S.W.2d 312, 316 (Mo.App. S.D.1998) ("Although the Statute of Frauds ordinarily bars enforcement of an oral contract to convey land, equity may, in some circumstances, require performance of such an agreement to prevent a fraud."); *Holt v. Story*, 642 S.W.2d 394, 396 (Mo.App. E.D.1982) ("An exception to the statute of frauds is invoked if application of the statute will work a fraud on the party who relies on the oral contract."); *Lederle v. Lederle*, 916 S.W.2d 423, 428 (Mo. App. E.D.1996) (noting that an equitable exception exists to the statutes of fraud provided for in § 432.010 and § 400.8–319 where the application of the bar contained therein would serve to work a fraud);

(b) by application of promissory estoppel;

See *Am. Realty Trust, Inc. v. First Bank of Mo., Gladstone*, 902 S.W.2d 884, 887 (Mo.App. W.D.1995) (noting that the doctrine of promissory estoppel "has sometimes been held to remove an oral contract from the statute of frauds"); *Midwest Energy, Inc. v.*

---

*Cavalier Homes of Ala., Inc. v. Sec. Pac. Hous. Servs., Inc.*, 5 F.Supp.2d 712 (E.D.Mo. 1997). In *Horseshoe Entertainment*, the debtor attempted to enforce an oral agreement permitting prepayment of his debt without the assessment of an additional fee. *Horseshoe Entertainment*, 990 F.Supp. at 739. The court found that § 432.045 was applicable because the agreement was akin to a forbearance or financial accommodation. *Id.* at 742. The *Cavalier Homes* debtor attempted to enforce an oral agreement for late payments on its debt. *Cavalier Homes*, 5 F.Supp.2d at 715. In *obiter dicta*, the court there also stated that § 432.045 applied to preclude enforcement. *Id.* at 717.

**3.** Section 432.045.1 provides: "For the purposes of this section, the term "credit agreement" means an agreement to lend or forbear repayment of money, to otherwise extend credit, or to make any other financial accommodation." Section 432.045.2 states: "A debtor may not maintain an action upon or a defense to a credit agreement unless the credit agreement is in writing, provides for the payment of interest or for other consideration, and sets forth the relevant terms and conditions, except this subsection shall not preempt other specific statutes that authorize additional protection for consumer credit used in personal, family or household purposes and the limitations on credit agreements in subsection 3 of this section."

*Orion Food Sys., Inc.,* 14 S.W.3d 154, 160 (Mo.App. E.D.2000) (noting that a promissory estoppel exception exists to the statute of frauds); and

(c) where there has been partial or full performance.

*See Shumate v. Dugan,* 934 S.W.2d 589, 592 (Mo.App. S.D.1996) ("An oral contract is valid and enforceable, irrespective of the statute of frauds when there is proof of partial performance in furtherance of the agreement."); *Kackley v. Burtrum,* 947 S.W.2d 461, 464 (Mo.App. S.D.1997) (quoting *Skaggs v. Dial,* 861 S.W.2d 188, 191 (Mo.App. W.D.1993)) (" 'Equity will decree specific performance of such a contract [falling within the Statute of Frauds], however, if a party has acted to such a degree upon the contract that denying the party the benefit of the agreement would be unjust.' "); *Gegg v. Kiefer,* 655 S.W.2d 834, 839 (Mo.App. E.D.1983) (noting exception to statute of frauds where certain elements are met); *Holtmeier v. Dayani,* 862 S.W.2d 391, 400 (Mo.App. E.D. 1993) (noting that under Missouri law the full performance of an oral agreement by one of the parties takes the contract out of the statute of frauds); *Schmidt v. White,* 43 S.W.3d 871, 874 (Mo.App. W.D.2001) ("Despite the strict provisions of the Statute of Frauds, equity will enforce an oral contract for the sale of real estate if one party has partially performed or has done other acts in reliance on the contract, and thereby has changed his position so materially that gross injustice can only be avoided by enforcement of the contract.").

All three categories are somewhat related and generally can be said to be used to prevent fraud or gross injustice. *See Holt,* 642 S.W.2d at 396; *Lederle,* 916 S.W.2d at 428; *Schmidt,* 43 S.W.3d at 874. The exceptions are "rigidly scrutinized and sparingly invoked so that 'relief will be denied if there is doubt as to whether there has been a meeting of minds or full understanding of the terms sought to be enforced.' " *Estate of Conkle,* 982 S.W.2d at 316 (quoting *Lederle,* 916 S.W.2d at 428).

There have been no Missouri cases specifically addressing whether the fraud exception applies to the credit agreement statute of frauds, § 432.045. But this court has previously considered whether promissory estoppel would prevent a party from asserting § 432.045 as a defense. *American Realty Trust,* 902 S.W.2d at 887. *American Realty* involved the alleged promise of a bank to lend money needed to fund improvements to a motel. *Id.* at 885–86. The Appellants in that case argued that promissory estoppel precluded the Respondents from asserting the bar of § 432.045 as a defense. *Id.* at 887. In addressing the issue, we noted that "the doctrine of promissory estoppel ... has sometimes been held to remove an oral contract from the statute of frauds." *Id.* (citing *Moore v. Mo.-Neb. Express, Inc.,* 892 S.W.2d 696, 704 (Mo.App. W.D.1994)). In doing so, we did not distinguish the credit agreement statute of frauds from the general statute of frauds. *Id.* We went on to point out, however, that the loan agreement in that case contained a disclaimer pursuant to § 432.045.3 stating that the writing was the "complete and exclusive statement of the agreement" between the parties. *Id.* Because of the disclaimer, we found that the Appellants had failed to establish all the elements of promissory estoppel. *Id.* As a result, we ultimately held that promissory estoppel did not preclude the Respondents from using the bar of § 432.045 as a defense and affirmed the trial court's judgment. *Id.* In doing so, however, the *American*

*Realty* court relied on cases interpreting § 432.010, the traditional statute of frauds, to implicitly hold that promissory estoppel could be used to remove a contract from the bar of § 432.045, the credit agreement statute of frauds. *Id.*

In construing a statute, we " 'must presume that the legislature was aware of the state of the law at the time of its enactment.' " *Suffian v. Usher*, 19 S.W.3d 130, 133 (Mo. banc 2000) (quoting *Matter of Nocita*, 914 S.W.2d 358, 359 (Mo. banc 1996)). " 'Unless a statute clearly abrogates the common law either expressly or by necessary implication, the common law rule remains valid.' " *State ex rel. Brown v. III Invs., Inc.*, 80 S.W.3d 855, 860 (Mo.App. W.D.2002) (quoting *In re Estate of Parker*, 25 S.W.3d 611, 614 (Mo. App. W.D.2000)). Nothing in the language of § 432.045 either expressly or implicitly precludes the application of the established exceptions to the statute of frauds when dealing with an oral credit agreement.

Moreover, we see no logical reason why the fraud exception should not apply to the credit agreement statute of frauds in the same manner as does promissory estoppel. The purpose of promissory estoppel is avoid injustice. *Chesus v. Watts*, 967 S.W.2d 97, 106 (Mo.App. W.D. 1998). The purpose of the fraud exception to the statute of frauds is to prevent application of the bar from itself working a fraud, i.e., resulting in a "gross injustice." *Lederle*, 916 S.W.2d at 428. Both doctrines are to be rigidly scrutinized, sparingly invoked, and used only in extreme cases to avoid unjust results. *Id.; Geisinger v. A & B Farms, Inc.*, 820 S.W.2d 96, 98 (Mo.App. W.D.1991). Because of this, neither doctrine threatens abrogation of the general statute of frauds or the credit agreement statute of frauds. For these reasons, we hold that the fraud exception is applicable to the credit agreement stat-

ute of frauds, § 432.045, in the same manner it is to the general statute of frauds, § 432.010. Accordingly, the trial court erred in granting summary judgment as to Counts III, IV, and V of Appellants' second amended petition.

We next address the propriety of the trial court's application of the statute of frauds to Count I, alleging common law fraud, and Count II, asserting negligent misrepresentation. The general statute of frauds in Missouri, § 432.010, states that "[n]o action shall be brought ... upon any contract" meeting certain criteria unless such contract is in writing and signed by the party to be charged therewith. For over a century, this language has consistently been interpreted to bar only causes of action sounding in contract and to have no application to those sounding in tort. *See Corder v. O'Neill*, 176 Mo. 401, 75 S.W. 764, 774 (1903). In *Corder*, a realtor alleged that the owner of a mining lease promised to pay him a commission if he sold the mining lease by a specific date. *Id.* at 765–66. The realtor alleged that the owner then made an oral promise to the purchaser to extend the contract date so that the owner could deprive the realtor of his commission. *Id.* at 766. The court held that, while plaintiff's action had its origin in the contract with the defendant, his suit alleged a cause of action for fraud and damages resulting from the fraudulent conduct of the defendant and the statute of frauds had no application to that cause of action. *Id.* at 774. In reaching this conclusion, our Supreme Court made the following observations:

> While the contract entered into by defendant with plaintiff is the origin of the cause of action, it is not in fact a suit upon the contract, but is simply a concise statement of a cause of action for fraud, alleging the damages sustained by reason of the fraudulent conduct of the

defendant. The contract was an essential ingredient to the cause of action, and is embodied in the statement of it. The allegations ... as to the contract by defendant with plaintiff for the sale of this mining lease, and the performance of it by plaintiff, were necessary in order to place plaintiff in a position to complain of the fraudulent acts of defendant, which, it is averred, deprived him of the fruits of his labor in the performance of the contract.... This does not, however, affect the substantial averments of the petition, and would not prevent a recovery upon the true cause of action stated in the petition. The erroneous conception of this verbal agreement consists in treating it as a part of the cause of action, when its only purpose is that of being a part of the evidence which tends to establish the facts constituting the cause of action.

\* \* \*

This is not an action to enforce the verbal contract referred to in the petition, nor is it an action for the breach of it.... The statute of frauds has no application to the cause of action ...

*Id.*

Since *Corder,* numerous cases have held that our general statute of frauds only bars contract actions and does not apply to actions sounding in tort. *See Brown v. Hannibal Anesthesia Serv., Inc.,* 972 S.W.2d 646, 647–48 (Mo.App. E.D.1998) (holding that plaintiff's claim for fraudulent misrepresentation sounded in tort and that the fact that the alleged fraud arose in the course of contract negotiation did not allow the defendant to raise the statute of frauds as a defense to that cause of action); *Null v. K & P Precast Inc.,* 882 S.W.2d 705, 708 (Mo.App. E.D.1994) (noting that "the Statute of Frauds is a defense to a suit to enforce a contract," and, because the plaintiff's claim for fraudulent misrepresentation was founded on tort, the Statute of Frauds did not bar such a claim); *Frame v. Boatmen's Bank of Concord Vill.,* 782 S.W.2d 117, 123 (Mo.App. E.D.1989) (holding that plaintiff's claim for negligent misrepresentation sounded in tort, not contract, and, therefore, the statute of frauds did not apply to bar that claim); *Schulz v. Coleman,* 473 S.W.2d 716, 719 (Mo.1971) ("Appellant complains also that parol evidence received on the agreement to reconvey was inadmissible on account of the statute of frauds; however, the action was not one to enforce such an oral agreement, but rather one to set aside a deed on account of fraud, in which case the statute of frauds does not apply.").

Notwithstanding this vast body of Missouri law, the trial court relied on two federal district court cases, *Cavalier Homes of Alabama, Inc. v. Security Pacific Housing Services, Inc.,* 5 F.Supp.2d 712 (E.D.Mo.1997), and *Horseshoe Entertainment, L.P. v. General Electric Capital Corp.,* 990 F.Supp. 737 (E.D.Mo.1997), for the proposition that, under Missouri law, § 432.045, unlike the general statute of frauds, also serves to bar tort actions involving an alleged oral agreement. *Cavalier Homes* gratuitously addresses that issue in dicta and relies entirely upon *Horseshoe Entertainment* without providing any additional analysis. *Cavalier Homes,* 5 F.Supp.2d at 718.

Having reviewed *Horseshoe Entertainment* and the cases upon which it relies, we find that court's reasoning on this issue to be wholly unpersuasive. *Horseshoe Entertainment* made no attempt to analyze Missouri case law related to the application of statutes of fraud to tort actions and instead relied upon cases from Illinois, Colorado, and Louisiana, which held that the credit agreement statutes of fraud in those states precluded tort as well as con-

tract actions related to alleged oral credit agreements. *Horseshoe Entertainment,* 990 F.Supp. at 743–44.

The Illinois cases relied upon by *Horseshoe Entertainment* are based upon the broad language of the Illinois credit agreement statute of frauds, which provides that "[a] debtor may not maintain an action on *or in any way related to* a credit agreement unless the credit agreement is in writing . . .," and upon a clear legislative intent to bar any and all actions related in any way to a credit agreement. *See First Nat'l Bank in Staunton v. McBride Cheverolet, Inc.,* 267 Ill.App.3d 367, 204 Ill.Dec. 676, 642 N.E.2d 138, 142 (Ill.App.1994); *Klem v. First Nat'l Bank of Chicago,* 275 Ill.App.3d 64, 211 Ill.Dec. 828, 655 N.E.2d 1211, 1212–13 (1995). Similarly, Colorado courts have found that language in Colorado's credit agreement statute of frauds providing that "no debtor or creditor may file or maintain an action *or claim related to* an oral credit agreement" and the legislative history of that statute demonstrated a clear legislative intent to bar tort actions as well as contract actions. *Norwest Bank Lakewood, N.A. v. GCC P'ship,* 886 P.2d

299, 302 (Colo.Ct.App.1994); *See also Hewitt v. Pitkin County Bank & Trust Co.,* 931 P.2d 456, 458 (Colo.Ct.App.1995).

The Missouri statute, § 432.045, does not contain the expansive language found in the Illinois and Colorado statutes, nor do we have a legislative history reflecting a clear intent by the legislature that § 432.045 apply beyond contract actions. Accordingly, the reasoning in the Illinois and Colorado cases relied upon by the *Horseshoe Entertainment* court is not applicable to the case at bar.

The Louisiana Supreme Court has held that language similar to that in the Missouri statute serves to bar all causes of action or theories of recovery based upon an oral agreement to lend money. *Jesco Constr. Corp. v. Nationsbank Corp.,* 830 So.2d 989, 991–92 (La.2002). Having carefully reviewed the opinion in that case, we find the court's reasoning strained at best [4] and certainly not sufficiently persuasive to warrant ignoring a century of Missouri case law related to the general statute of frauds.

---

**4.** The Louisiana Supreme Court noted that their statute provided that "[a] debtor shall not maintain an action on a credit agreement unless it is in writing . . ." *Jesco Constr. Corp.,* 830 So.2d at 991. The court then reasoned:

> With regard to the term "action," we have previously stated that:
>> The Code [of Civil Procedure] defines "action" as a demand for the enforcement of a legal right. It is commenced by the filing of a pleading presenting the demand to the court. Cumulation of actions is the joinder of separate actions in the same judicial demand. Whether or not to cumulate separate actions is a discretionary decision to be made by a plaintiff. On the other hand, all actions arising out of the same transaction or occurrence must be brought together or be subject to a plea of res judicata. Several "actions" may therefore be present in the same lawsuit.

> Thus, all actions (or causes of action or theories of recovery) based upon an oral agreement to lend money are barred by [the Louisiana credit agreement statute of frauds].
> Jesco alleged in its petition breach of contract, detrimental reliance, negligent misrepresentation, unfair trade practices, breach of the duty of good faith and fair dealing, promissory and equitable estoppel, and breach of fiduciary duty. The basis for each and every one of these causes of action is the failure by BACF to make a loan based upon an alleged oral credit agreement. Therefore, each and every cause of action stated by Jesco in its petition is barred by [the Louisiana credit agreement statute of frauds].

*Id.* at 991–92 (citations omitted).

Section 432.045 bars any "action upon ... a credit agreement unless the credit agreement is in writing" in similar fashion to our general statute of frauds which bars actions "upon any contract." As noted, *supra*, this type of language has been interpreted by Missouri courts to bar contract actions on certain oral agreements but not to extend to actions involving such oral agreements which sound in tort. In construing a statute, we " 'must presume that the legislature was aware of the state of the law at the time of its enactment.' " *Suffian*, 19 S.W.3d at 133 (quoting *Matter of Nocita*, 914 S.W.2d at 359). " 'Unless a statute clearly abrogates the common law either expressly or by necessary implication, the common law rule remains valid.' " *Brown.*, 80 S.W.3d at 860 (quoting *In re Estate of Parker*, 25 S.W.3d at 614). Accordingly, we can only conclude that, had the Missouri legislature intended for § 432.045 to bar all causes of action in any way related to an oral credit agreement, the legislature would have included broader language than that contained in the general statute of frauds, as was done by the legislatures in Illinois and Colorado. As pertains to tort actions or equitable exceptions to application of the statute, nothing in the language of § 432.045 convinces us that the legislature intended for it to be treated differently than the general statute of frauds.

For the foregoing reasons, the trial court erred in granting summary judgment as to Counts I and II of Appellants' second amended petition.

■■■ Appellants argue in point two that the trial court erred in granting summary judgment on Count VI, the civil conspiracy count, because they presented sufficient facts and evidence to withstand summary judgment.

The trial court determined that there was no evidence to show that Respondents Pletz, Hoffine, Cascio, UHS and IAD had any knowledge of the friendly foreclosure agreement or that the purpose of the agreement was to defraud the Appellants. Therefore, the trial court determined that Respondents Pletz, Hoffine, Cascio, UHS and IAD were entitled to summary judgment on the conspiracy claim for that reason, without regard to the statute of frauds issues. The trial court ruled that the conspiracy claim against Morgan, Dana and Central Bank would survive summary judgment, but for the statute of frauds. The trial court stated in a footnote, however, that it was unsure whether the bank officers can conspire with each other and the bank.

■■■ To state a claim for civil conspiracy, Appellants must establish the following: "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) the plaintiff was thereby injured." *Phelps v. Bross*, 73 S.W.3d 651, 657 (Mo. App. E.D.2002).

To establish a claim for civil conspiracy, the proof must be "such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." There must be clear and convincing proof that the alleged conspirator "knowingly performed any act or took any action to further or carry out the unlawful purposes of the conspiracy." In addition and by its nature, a conspiracy has as its object or purpose the obtaining of a benefit for the conspirator.

*Preferred Physicians Mut. Mgmt. Group v. Preferred Physicians Mut. Risk Retention*, 918 S.W.2d 805, 815 (Mo.App. W.D. 1996) (quoting *Chmieleski v. City Prods.*

*Corp.,* 660 S.W.2d 275 (Mo.App.1983)) (internal citations omitted).

■▬▬▬▬ There can be no conspiracy between an agent and a principal. *Metts v. Clark Oil & Refining Corp.,* 618 S.W.2d 698, 702 (Mo.App. E.D.1981); *See also Macke Laundry Serv. Ltd. P'ship v. Jetz Serv. Co., Inc.,* 931 S.W.2d 166, 176 (Mo. App. W.D.1996). Two entities that are not legally distinct cannot conspire with one another. *Macke Laundry Service,* 931 S.W.2d at 176. "[T]he general rule holds that a corporation cannot conspire with its own employees." *Metts,* 618 S.W.2d at 702. "An exception to this general rule exists when an employee has an independent personal stake in achieving the object of the conspiracy." *Id.; See also Creative Walking, Inc. v. Am. States Ins. Co.,* 25 S.W.3d 682, 688 n. 3 (Mo.App. E.D.2000).

Appellants presented no evidence that Morgan or Dana had an interest independent from the bank in the alleged "friendly foreclosure" agreement. On appeal, Appellants claim that Morgan and Dana were acting in their own self-interest because they "were not lower level employees ... but high ranking officers that would benefit anytime the bank made money." In addition, Appellants state that Dana and Morgan wanted to keep their jobs and promote their relationships with the members of the board.

In *Metts,* the Eastern District of this court discussed what is required for an employee to have an independent stake sufficient to permit a finding of conspiracy between a corporation and its employee. *Metts,* 618 S.W.2d at 702. In doing so, the court analyzed *Coleman Motor Co. v. Chrysler Corporation,* 525 F.2d 1338 (3rd Cir.1975), noting that a conspiracy was found therein based on the co-conspirators being managers of factory dealerships that were separately incorporated. *Id.* The *Metts* court then stated that "[w]ithout such an organization legally distinct from the principal defendant, it would be impossible for an employee to have an interest that was truly independent." *Id.* Finding that Respondent Clark Oil's employees did not have such an independent stake, the court held that they could not have conspired with Clark Oil. *Id.*

In the instant appeal, Appellants main evidence to support a conspiracy claim is the fact that Morgan, Dana, Pletz and Cascio are all board members of Central Bank and that Pletz was affiliated with UHS and Cascio was the realtor who handled the sale for UHS. However, Appellants have alleged that they only discussed the "friendly foreclosure" with Morgan, and there is nothing in the record suggesting that any of the board members were aware of the alleged agreement.

Ten days after the foreclosure proceedings, Appellants claim that Morgan told them that Central Bank did not plan to honor its agreement. Central Bank then entered into a real estate contract to sell the property to IAD, a non-profit corporation incorporated two days before the foreclosure sale. Cascio, the realtor and a board member of the bank, earned a $25,000 commission for the sale.

Appellants further assert that the decision to foreclose was made by the board, but the record reflects that it was Dana and Morgan who made the decision to foreclose on the property after reviewing the loans, not the board of directors. Both Morgan and Dana testified during depositions that foreclosures are discussed in general terms at board meetings, but that the board does not vote on such matters. However, even if the foreclosures were discussed, there is still no indication in the record that the board members had any knowledge of the alleged "friendly foreclosure" agreement between Morgan and the Appellants.

Appellants point out that Morgan discussed initiating foreclosure proceedings with staff counsel on November 18, 1998, the day after Appellants refused the offer from UHS. We fail to see how this demonstrates that Respondents Cascio and Pletz had any knowledge of the alleged "friendly foreclosure" agreement. Moreover, as noted by Respondents, the bankruptcy court granted relief from the automatic stay on November 16, 1998, and it is reasonable to infer this was why foreclosure discussions were first had on November 18th.

While Appellants claim that there was clearly an effort by Respondents to assist, encourage or plan the misrepresentations by Morgan, they presented nothing more than bare assertions. The decision to sell the property to IAD was made by the board, and Cascio and Pletz abstained from voting on the issue.

The unlawful conduct that forms the basis of Appellants' alleged conspiracy is Morgan's alleged misrepresentations to Appellants. There is nothing in the record before us, however, that even suggests that the other named Respondents, Pletz, Hoffine, Cascio, UHS and IAD, had any knowledge of those alleged misrepresentations. Consequently, Appellants are lacking an essential element of a conspiracy as to those Respondents. In addition, there was no evidence to support a finding that Dana and Morgan had an independent stake in the transactions, and, therefore, as a matter of law, there can be no conspiracy between them and their employer, Central Bank. As a result, we find no error in the trial court's decision as to Count VI.

The trial court's grant of summary judgment to Respondents on Counts I, II, III, IV and V is reversed, and the cause is remanded for further proceedings consistent with this opinion. The trial court's grant of summary judgment to Respondents on Count VI is affirmed.

All concur.